### UNITED STATES v. AMERICAN TOBACCO CO. et al.

#### (Circuit Court, S. D. New York. November 7, 1908.)

1. MONOPOLIES (§ 12*) — "COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE."

Every combination which restrains free competition in interstate trade is a combination in restraint of interstate commerce, in violation of Sherman Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 2, pp. 1275–1276; vol. 8, p. 7606.]

2. MONOPOLIES (§ 20*) — "COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE"—CONSOLIDATION OF COMPETING CORPORATIONS.

The consolidation into one corporation of a large number of corporations engaged in the different branches of the tobacco industry, many of which were previously active competitors in interstate and foreign commerce, with the result of eliminating such competition and of giving the consolidated company control of at least 75 per cent. of the entire manufactured tobacco business of the United States, including the interstate trade therein, constitutes a "combination in restraint of interstate commerce," in violation of Sherman Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

3. COMMERCE (§ 40*)—"INTERSTATE COMMERCE"—WHAT CONSTITUTES.

A corporation engaged in the manufacture and sale of tobacco in its various forms, which purchases its raw materials and supplies in different states and in foreign countries, and ships them by means of common carriers into other states for manufacture, and its products from one state into another between its different factories and agencies, and sells the same by means of agencies and salesmen throughout the United States and in the markets of the world, is engaged in "interstate commerce," and it is immaterial that it distributes its products by means of common carriers or that the title technically passes on delivery to such carriers.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 29, 30; Dec. Dig. § 40.*

For other definitions, see Words and Phrases, vol. 4, pp. 3724–3731.]

4. MONOPOLIES (§ 17*)—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE —SUBSIDIARY CORPORATION—"UNLAWFUL MONOPOLY."

A corporation engaged in selling tobacco products at retail is not rendered unlawful by the fact that a majority of its stock is owned by another corporation, which is itself an unlawful combination in restraint of interstate commerce, and which sells to the retailing corporation the

———

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

larger part of its goods, where the latter conducts its business independently in a lawful manner, and sells also goods of other manufacturers. Nor does it constitute an "unlawful monopoly," in violation of Sherman Act July 2, 1890, c. 647, § 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), because it operates in the several states 400 retail stores out of 600,000 places where tobacco is sold.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 17.*]

Ward, Circuit Judge, dissenting.

In Equity.

J. C. McReynolds and Edwin P. Grosvenor, Sp. Asst. Attys. Gen., for complainant.

William J. Wallace, W. W. Fuller, Delancey Nicoll, and Junius Parker, for American Tobacco Co. and constituent companies.

William B. Hornblower, W. W. Miller, Morgan M. Mann, and John Pickrell, for Imperial Tobacco Co.

Charles R. Carruth, for R. P. Richardson, Jr., & Co., Inc.

Stroock & Stroock (S. M. Stroock, of counsel), for United Cigar Stores Co.

Before LACOMBE, COXE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), in its first section, declares to be illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations." That declaration, ambiguous when enacted, is, as the writer conceives, no longer open to construction in the inferior federal courts. Disregarding various dicta and following the several propositions which have been approved by successive majorities of the Supreme Court, this language is to be construed as prohibiting any contract or combination whose direct effect is to prevent the free play of competition, and thus tend to deprive the country of the services of any number of independent dealers however small. As thus construed the statute is revolutionary. By this it is not intended to imply that the construction is incorrect. When we remember the circumstances under which the act was passed, the popular prejudice against large aggregations of capital, and the loud outcry against combinations which might in one way or another interfere to suppress or check the full, free, and wholly unrestrained competition which was assumed, rightly or wrongly, to be the very "life of trade," it would not be surprising to find that Congress had responded to what seemed to be the wishes of a large part, if not the majority, of the community, and that it intended to secure such competition against the operation of natural laws. The act may be termed revolutionary, because, before its passage, the courts had recognized a "restraint of trade" which was held not to be unfair, but permissible, although it operated in some measure to restrict competition. By insensible degrees, under the operation of many causes, business, manufacturing and trading alike, has more and more developed a tendency toward larger and larger aggregations of capital and more extensive com-

binations of individual enterprise. It is contended that, under existing conditions, in that way only can production be increased and cheapened, new markets opened and developed, stability in reasonable prices secured, and industrial progress assured. But every aggregation of individuals or corporations, formerly independent, immediately upon its formation terminates an existing competition, whether or not some other competition may subsequently arise. The act as above construed prohibits every contract or combination in restraint of competition. Size is not made the test: Two individuals who have been driving rival express wagons between villages in two contiguous states, who enter into a combination to join forces and operate a single line, restrain an existing competition; and it would seem to make little difference whether they make such combination more effective by forming a partnership or not.

Accepting this construction of the statute, as it would seem this court must accept it, there can be little doubt that it has been violated in this case. The formation of the original American Tobacco Company, which antedated the Sherman act, may be disregarded. But the present American Tobacco Company was formed by subsequent merger of the original company with the Continental Tobacco Company and the Consolidated Tobacco Company, and when that merger became complete two of its existing competitors in the tobacco business were eliminated.

What benefits may have come from this combination, or from the others complained of, it is not material to inquire, nor need subsequent business methods be considered, nor the effects on production or prices. The record in this case does not indicate that there has been any increase in the price of tobacco products to the consumer. There is an absence of persuasive evidence that by unfair competition or improper practices independent dealers have been dragooned into giving up their individual enterprises and selling out to the principal defendant. In this connection interesting testimony is given by one of the government's witnesses. The deponent was for many years an independent dealer and secretary of the Independent Tobacco Manufacturers' Association. He testified:

"My business was conducted by me alone. I had no partner, no corporation. It had got to be a large business, and if anything happened to me there was no one there to continue it. The value of the business was in a brand, and I became fearsome what would happen to it if I would be disabled in any way. It would not be much value to my estate unless some one had a knowledge of the business and knew how to manage it, and then I believed there was a maximum business beyond which you cannot conduct it profitably personally. It will get so big that it requires an organization. And then, too, I was only identified as a scrap tobacco manufacturer; and, going by precedent, the consuming public of tobacco changes every 10, 12, or 15 years, and I have figured that might happen again, and it wouldn't use scrap tobacco, and might use something else, and then I would not have much business, I thought; whereas the American Tobacco Company had been in conference with me, I knew the officers, and I made up my mind, when a proper proposition was made to me, such as was satisfactory to me, I would be very anxious to affiliate myself with a good, big tobacco organization, large enough and strong enough to take care of all conditions that might come up. I was not induced to sell out by a decrease of profits or by any unfair competition. I never had any fear they could drive me out of business."

During the existence of the American Tobacco Company new enter-prises have been started, some with small capital, in competition with it, and have thriven. The price of leaf tobacco—the raw material—except for one brief period of abnormal conditions, has steadily in-creased, until it has nearly doubled, while at the same time 150,000 additional acres have been devoted to tobacco crops and the consump-tion of the leaf has greatly increased. Through the enterprise of de-fendant and at large expense new markets for American tobacco have been opened or developed in India, China, and elsewhere. But all this is immaterial. Each one of these purchases of existing concerns, com-plained of in the petition, was a contract and combination in restraint of a competition existing when it was entered into, and that is suffi-cient to bring it within the ban of this drastic statute.

A large part of the record is taken up with testimony as to conceal-ment of the relations existing between some of the defendants. It is difficult to see what bearing this has on the questions in controversy. If an agreement by a corporation to acquire a majority of the stock in a competing corporation is obnoxious to the statute, its vice is certainly not eradicated by the promptest publicity. If, on the other hand, such an agreement is innocent, it does not become guilty merely because the parties to it keep their own counsel about their mutual transactions.

It is contended that the case at bar is not within the statute, since the various combinations complained of deal primarily with manufac-ture; and United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, is cited in support of that proposition. It seems to the writer, however, that subsequent decisions of the Supreme Court have modified the opinion in that case, and that the one at bar is as much within the statute as was the combination condemned in Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488. Relief under the statute should be granted against the several domestic corporations defendant.

The Imperial Tobacco Company of Great Britain and Ireland, Lim-ited, is one of the defendants. It is a British corporation and entered into a contract with the American Tobacco Company in the city of London, where such contract was a legal and proper one. It is ap-parently the contention of petitioner that subsequent acts of the Im-perial Tobacco Company in this country practically amount to the entering into a combination or contract of the sort specified in the statute. So far as appears the only transactions of that company here are these: It buys leaf tobacco of the American grower in very large quantities by its own independent force of purchasing employés. It does not sell its manufactured products here—indeed, such prod-ucts, having to pay both tariff duties and revenue tax, could not be sold here except at a loss, save in the case of a few fancy high-priced brands. It may be an enlightened public policy to prohibit an alien corporation from buying its raw material in this country unless it sends its products here to compete with American manufacturers; but, if it be, this act seems not to have gone to that extent. The petition should be dismissed as to the Imperial Tobacco Company. A like dis-position should be made as to the British-American Company.

As to relief: In the main brief it is prayed that the domestic defendants the American Tobacco Company, American Snuff Company, and others enumerated, should be restrained from carrying on interstate or foreign commerce until conditions existing before illegal contracts or combinations were entered into are restored. Such relief is certainly drastic enough and should be efficient. In the petition it is prayed that receivers be appointed for the various companies, who apparently are to conduct a tobacco business and create some sort of artificial competition to take the place of the natural competition which, it is alleged, was destroyed by the combinations. Such a scheme seems impracticable and is wholly unnecessary.

I concur with Judge COXE in his reasoning and conclusions touching the United Cigar Stores Company and the R. P. Richardson, Jr., Company, and agree that issuance of injunction should be suspended until after decision on appeal.

COXE, Circuit Judge (concurring). As we are unanimous in thinking that the testimony shows no case for a receiver and that the bill should be dismissed as to the defendants, the Imperial Tobacco Company and the British American Company, nothing need be added to what Judge LACOMBE has written in arriving at these conclusions. I concur with him in the result reached as to the other defendants except in some minor particulars which will be noted hereafter.

The "Tobacco Trust," so called, consists of over 60 corporations, which, since January, 1890, have been united into a gigantic combination which controls a greatly preponderating proportion of the tobacco business in the United States in each and all its branches; in some branches the volume being as high as 95 per cent. Prior to their absorption many of these corporations had been active competitors in interstate and foreign commerce. They competed in purchasing raw materials, in manufacturing, in jobbing and in selling to the consumer. To-day those plants which have not been closed, are, with one or two exceptions, under the absolute domination of the supreme central authority. Everything directly or indirectly connected with the manufacture and sale of tobacco products, including the ingredients, the packages, the bags and boxes, are largely controlled by it. Should a party with moderate capital desire to enter the field it would be difficult to do so against the opposition of this combination. That many of the associated corporations were not coerced into joining the combination but entered of their own volition is quite true, but in many other instances it is evident that if not actually compelled to join, they preferred to do so rather than face an unequal trade war in which the odds were all against them and in which success could only be achieved by a ruinous expenditure of time and money.

The power to destroy a too formidable rival, assuming that the allied companies see fit to exercise it, can hardly be denied. We are not dealing with these companies as they existed prior to 1890 but with the consolidated unit controlling a preponderating proportion of the tobacco business in its most minute details. Prior to that date the manufacturing companies, the purchasers, the distributors and

the selling companies were each and all operating independently and tobacco products were being transported back and forth to every state of the Union and to foreign countries. Since 1890 this vast interstate and foreign trade which was formerly carried on by this large number of competing companies and individuals is now carried on by one combination. The free interchange of commerce has been interfered with, hampered, diverted and, in some instances, destroyed. Though it may be greater in volume it does not flow through the old channels, it is not free and unrestrained. It may be true that there are individual members of this combination not engaged in interstate commerce—manufacturing companies merely and therefore not engaged in commerce within the rule enunciated in United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325. But here the complaint is made not against the individual conspirators separately but against the combination as a whole. Has it monopolized or restrained any part of interstate or foreign commerce? If so, it would seem that it is liable under the act. To illustrate, A. is a manufacturer of tobacco in New York, B. is a buyer of raw material in Kentucky, C. is a jobber in Pennsylvania and D. is a retailer in Boston. B. sends the leaf tobacco from Louisville to New York, A. manufactures it into smoking and chewing tobacco and sends it to C. at Philadelphia, who in turn ships it to D. at Boston, who sells it to the public. Should A., B., C. and D. enter into a copartnership to do as a firm what they had hitherto done as individuals can there be a doubt that the firm would be engaged in interstate commerce?

The defendants, with the exception of the Imperial Company, the Cigar Stores Company and the Richardson Company, admit as follows:

"We admit that all the vendors and corporation defendants mentioned in the petition as engaged in the manufacture and sale of tobacco products, except Imperial Tobacco Co., Ltd., purchased or now purchases some or all of the requisite raw material in states or countries other than those in which the factories were or are located, and had or has it transported thence through the medium of common carriers to said factories, and employed or employ traveling salesmen who solicited or solicit in states or countries other than those in which the factory was or is located, orders for the tobacco products which by them were or are transmitted to said factory or other chief office of the manufacturer, and, if approved, they are filled by the delivery of the goods to a common carrier where the factory was or is located, duly consigned to the purchaser, title passing to said purchaser on said delivery to the common carrier."

If the contention of the defendants, that this does not constitute interstate commerce be correct, then it would seem to follow that no one can be engaged in such commerce unless he be a carrier, common or private, between the states. In the illustration just given it seems to be conceded, if one of the partners had been a common carrier owning a ferry, for instance, by which the goods were carried across the Ohio river, and this business had been taken over with the rest, that the firm would be engaged in interstate commerce. If, however, it employs others to carry its goods from state to state it is argued that it is not so engaged. In other words, although the so-called "Tobacco Trust" is buying raw material and selling its completed products in the mar-

kets of the world, it is not engaged in "trade or commerce among the several states or with foreign nations" because carriers are employed to convey the goods from state to state and to foreign countries. I cannot but think that this is too narrow a construction. Should it obtain, the statute will be eviscerated. No matter how odious or complete the monopoly, it will be immune from punishment if it can show that others have been employed to distribute its goods.

It is not an answer to say that the remedy may be applied by the states, for the reason that by the Constitution, to Congress is delegated the sole power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." In this domain the law of the national legislature is supreme and the states have no power to interfere. Dealing as it does with national and international commerce, the law must be unaffected by local conditions and it must be uniform. The conditions surrounding interstate commerce differ so materially in the various sections of the Union that it is not to be expected that anything like uniformity can obtain without the action of Congress.

At present the state laws are not harmonious and are as numerous as the states. In some of the states the tendency is to encourage commerce, in others to harass it with vexatious requirements. The framers of the Constitution were well aware of all this when they relegated the control of interstate commerce to the exclusive control of the national legislature.

The duty of this court is to ascertain the true meaning of the antitrust act as expounded by the Supreme Court and, as so interpreted, to enforce it.

The Knight Case, supra, which is principally relied on by the defendants was the first case under the act to reach the Supreme Court. It was decided in January, 1895, and held in substance that the combination of a number of refineries to manufacture sugar was not within the act because manufacture alone is not commerce and therefore not within the control of Congress. The facts are similar to those relating to the absorption of several of the corporations in the case before us but not similar to all for the reasons which have been alluded to. In the Knight Case it was held that commerce was only incidentally affected. Mr. Justice Harlan in his dissenting opinion thus defines interstate commerce:

"Interstate commerce does not, therefore, consist in transportation simply. It includes the purchase and sale of articles that are intended to be transported from one state to another—every species of commercial intercourse among the states and with foreign nations."

The facts clearly bring the case at bar within this definition for the raw materials and the manufactured products were not only intended to be transported from one state to another but actually were transported, in many instances, before the title had passed from the manufacturer to the jobber, retailer or consumer. It is interesting to note that the Chief Justice, who wrote the opinion of the court in the Knight Case, also wrote the unanimous opinion in Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, which is the latest exposition of the law.

An examination of the numerous decisions since the Knight Case leads to the conclusion that there has been a general tendency towards a broader and more liberal construction of the statute. In the Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, the opinion is written by Mr. Justice Harlan who dissented in the Knight Case. The previous decisions of the court are by him carefully reviewed and the point ruled in each is clearly stated. Of the Knight Case it is said:

"It was held that the agreement or arrangement there involved had reference only to the manufacture or production of sugar by those engaged in the alleged combination, but if it had directly embraced interstate or international commerce, it would then have been covered by the anti-trust act and would have been illegal."

He reviews all the prior decisions and formulates certain propositions which, in his opinion, are plainly deducible therefrom (page 331 of 193 U. S., page 436 of 24 Sup. Ct. [48 L. Ed. 679]). Some of these are as follows:

The anti-trust act embraces and declares to be illegal every contract combination or conspiracy, in whatever form, of whatever nature and whoever may be the parties to it, which directly or necessarily operates in restraint of interstate or international trade or commerce. The act is not limited to unreasonable restraints but embraces all direct restraints.

The natural effect of competition is to increase commerce and an agreement whose direct effect is to prevent this play of competition restrains trade and commerce. To vitiate such an agreement or combination it is not necessary to prove a total suppression of trade. It is only essential to show that by its necessary operation it tends to restrain interstate or international trade or commerce or tends to create a monopoly in such trade or commerce and to deprive the public of the advantages that flow from free competition.

Of course the facts in the Northern Securities Case differ essentially from those in the case at bar; but the language used in the opinion leaves little doubt that had the present combination been before the court, the majority would have declared it illegal. For instance the court says (page 337 of 193 U. S., page 457 of 24 Sup. Ct. [48 L. Ed. 679]):

"In all the prior cases in this court the anti-trust act has been construed as forbidding any combination which by its necessary operation destroys or restricts free competition among those engaged in interstate commerce; in other words, that to destroy or restrict free competition in interstate commerce was to restrain such commerce."

In Loewe v. Lawlor the court held the act applicable to members of a labor organization who by means of a boycott were endeavoring to destroy the business of a manufacturer of hats. The defendants were in no way engaged in interstate trade or commerce and the plaintiffs made hats in Connecticut and sold them in that and other states. So far as the business affected is concerned, the only distinction between the Knight Case and the Loewe-Lawlor Case is that in one the acts complained of related to the manufacture and sale of sugar and in the other to the manufacture and sale of hats.

The act cannot be invoked unless interstate or foreign trade or commerce is involved, and the court decided that interstate commerce was involved in Loewe and Lawlor although the case was presented on demurrer to the complaint, which alleged that the complainants resided at Danbury, Conn., and were "located and doing business as manufacturers and sellers of hats there." It was held, without dissent, that a combination to boycott the goods of the Danbury manufacturers, and prevent their sale in states other than Connecticut, was in restraint of interstate trade.

Of course, the facts differ materially, but the decision of the later case renders untenable the broad construction of the Knight Case contended for by the defendants, viz., that in no instance where a manufacturing corporation is concerned can relief be granted for the reason that interstate commerce though indirectly affected, is not sufficiently involved to justify proceedings under the act.

Since the Knight Case the tendency has been constantly towards a wider scope for the statute and I cannot believe that it is so impotent that it can be evaded, by the mere manipulation of a bill of lading— enforceable when a combination of manufacturers transports its products to other states and sells them there and utterly ineffectual if the precaution be taken to see that the title passes to the purchaser at the place of manufacture.

But even if it be conceded that the doctrine of the Knight Case, strictly construed, was applicable to some of the absorbed corporations and copartnerships, it certainly was not applicable to all, as some of them were unquestionably engaged in importing and selling their products by means of international and interstate commerce and there can be little doubt that the combination considered as a unit is so engaged. When merchandise is shipped from one state to another it seems obvious that the consignor or consignee is engaged in interstate commerce, or that both are so engaged. It cannot be that none of the parties, who set the wheels of transportation in motion on land and sea, is engaged in commerce and that Congress intended that the act should apply solely to common carriers. And yet, if no one can engage in trade or commerce between the states unless the actual physical transportation of the merchandise is done by him, it is obvious that the act can have no broader interpretation.

The law should not be defeated by a mere fiction. When a large number of independent corporations, firms and individuals are engaged in purchasing and manufacturing tobacco in several states and selling it in every part of the United States and in foreign countries, it seems clear that this is done through the instrumentality of interstate and foreign commerce. Without such commerce the business could not be conducted for a moment, the raw material would be left to rot in the warehouse, the manufactured product in the factory. The free interchange of these commodities, wherever they may be needed for barter or sale, is the life of the enterprise. Trade is the business of exchanging commodities by buying and selling for money. Interstate trade is the business of buying, selling and exchanging commodities between the states, and parties may be so engaged even though they act through

the agency of carriers. If then, the business of the independents above referred to be destroyed, interstate trade and commerce is destroyed to that extent, if the business of one or more of them be destroyed, interstate trade and commerce is destroyed pro tanto; in other words, there is less interchange of tobacco and its products between the states.

If I am right in thinking that many of the constituent companies were engaged in interstate commerce and that the breaking up of their business would inevitably affect the commerce of the country, it follows that their consolidation must produce a like result. The combination which has thus checked and hindered commerce and restrained its free circulation, has been guilty of a "restraint of trade or commerce among the several states," within the meaning of the act as interpreted by the Supreme Court. For these reasons I think an injunction should issue.

I am of the opinion, however, that it should not issue against the United Cigar Stores Company and should not issue, at least for the present, against R. P. Richardson, Jr., Company. In May, 1901, George J. Whelan and associates organized the United Cigar Stores Company for the purpose of retailing cigars and tobacco. This was done without the knowledge of the American Tobacco Company which refused to assist the enterprise in any way until its success as a selling agent was clearly demonstrated and established. It was at the suggestion of Whelan, not of the Tobacco Company, that its money was invested in the enterprise. Thereupon the Tobacco Company acquired a controlling interest in the Stores Company which has been held continuously and has been increased from time to time. Whelan and his associates have the active management of the Stores Company which deals in the products of the defendants and also of independent manufacturers. No member of the Tobacco Company or of its subsidiary companies is a member of the board of the Cigar Stores Company, and the evidence falls far short of establishing the proposition that the stores are managed in the interest of the Tobacco Company to the exclusion of other manufacturers. On the contrary, the weight of testimony is to the effect that the aim and purpose of the stores is to furnish anything that a user of tobacco may desire no matter by whom made. The company operates about 400 stores scattered throughout the United States but when it is realized that there are in this country over 600,000 places where tobacco is sold the impossibility of monopolizing the retail trade by one who operates only six-tenths of 1 per cent. of these places will at once be apparent. It cannot be assumed that a company which sells the products of all alike intends to secure a monopoly for one. Neither is the fact that the business is conducted in a large number of stores important.

The statute was not intended to strike down enterprise or to prevent the restraint of trade by destroying it. Many large merchants find it profitable to conduct their business through a chain of stores and it has never been held that the mere fact that a business is large and is extended over a wide territory renders its promoters amenable to the statute. Success is not a crime. Eliminating the fact that the Tobacco Company has a large pecuniary interest in the Stores Com-

pany, there is absolutely nothing left upon which to base the charge of a conspiracy to restrain and monopolize trade.

I cannot believe that the fact that a corporation, assuming it to have combined with others to restrain trade, invests its money in the business of another corporation engaged in selling its goods and those of others fairly to the public is of itself sufficient to convict the latter corporation of entering into a conspiracy to monopolize interstate commerce. If the business of the United Stores Company was and is legitimate, it cannot be condemned simply because the Tobacco Company has, in other respects, been guilty of unlawful conduct. The Cigar Stores Company and the Tobacco Company were not and could not be competitors; the former manufactures and sells tobacco by the wholesale, the latter sells whatever its customers want, no matter by whom manufactured, at retail only. It is true that the Cigar Stores Company has been energetically and, perhaps, aggressively managed; it is true that a part of the business thus built up would have been done by others had the company not been formed; but this is true of every large and successful business. Prosperity is the premium which has always been awarded to earnest and intelligent endeavor. The statute was never intended to punish success or reward incompetency. The proof fails to establish unfair or unlawful methods in acquiring and conducting the business of the Cigar Stores.

There were a few instances in which a business was purchased and, as the vendor was to continue in charge, a covenant was taken binding him not to engage in business in that locality on his own behalf. Such transactions are not forbidden. In the Joint Traffic Case, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259, the court says, at page 567 of 171 U. S., at page 31 of 19 Sup. Ct. (43 L. Ed. 259):

"It might also be difficult to show that the appointment by two or more producers of the same person to sell their goods on commission was a matter in any degree in restraint of trade. We are not aware that it has ever been claimed that a lease or purchase by a farmer, manufacturer or merchant of an additional farm, manufactory or shop or the withdrawal from business of any farmer, merchant or manufacturer, restrained commerce or trade within any legal definition of that term; and the sale of a good will of a business with an accompanying agreement not to engage in a similar business was instanced in the Trans-Missouri Case, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, as a contract not within the meaning of the act; and it was said that such a contract was collateral to the main contract of sale and was entered into for the purpose of enhancing the price at which the vendor sells his business."

No special privileges are accorded by the Tobacco Company to the Cigar Stores Company over other purchasers. Its business is conducted in its own way, without dictation from the Tobacco Company. I do not overlook certain sporadic instances of fault finding and attempted interference in the business by certain officers of the Tobacco Company but these attempts were negligible and should not be considered in determining the general character of the business. Generally speaking the relations existing between the two were those of a manufacturer and a retail customer, to whom the manufacturer sells direct. In short, the only circumstances which distinguish the Stores Company from other large dealers in the Tobacco Company's products

is that a majority of its stock is owned by the latter, and, as we have seen, this is insufficient to convict it under the law.

No injunction should issue against the R. P. Richardson, Jr., Company, at least for the present, for the following reasons: Very soon after a controlling interest in the Richardson Company had been purchased by the Tobacco Company disputes arose as to the terms and conditions of the agreement, which resulted in a suit being commenced by the Richardson Company in the courts of North Carolina for the purpose of having the contracts and agreements between the companies set aside and the status existing prior to the negotiations restored. This was followed shortly afterwards by a suit by the Tobacco Company in the courts of New Jersey to compel the Richardson Company to transfer a controlling interest in its stock to the Tobacco Company. Both of these actions are pending and undetermined, the prosecution of the North Carolina action having been enjoined by the New Jersey court. It is manifest that the trial of these actions, or one of them, may dispose of the issues now pending and that if the Richardson Company succeeds in establishing the fraud and misrepresentation alleged, relief may be granted which this court has not jurisdiction to grant. The issuing of the injunction should, therefore, be suspended until the hearing and determination of the actions in the state courts.

In view of the importance of the questions involved and the certainty that the case will be carried to the Supreme Court I think the injunction should not issue pending the hearing and decision in that court.

NOYES, Circuit Judge (concurring). The modern tendency of business is toward co-operation, instead of competition. This tendency, while of earlier inception, has developed with phenomenal activity in this country during the past 20 years—especially during the past decade. Concentration of interests and unification of control have taken the place of separate and independent operation. Important industrial corporations, formerly competing, have been combined into greater companies of wider scope, and these, in turn, have been united into combinations with vast resources, embracing, as their fields of operation, whole branches of industry.

And yet this economic development toward the elimination of competition has taken place in the face of statutes and judicial decisions declaring that "competition is the life of trade" and must be preserved. Combinations to prevent competition have always been declared contrary to public policy by the courts, and Congress, in the anti-trust statute of 1890, shortly after the inception of this economic movement and in view of the "trusts" of the period, went further than the common law and made those combinations which before had only been negatively unlawful positively criminal.

In so far as combinations result from the operation of economic principles, it may be doubtful whether they should be stayed at all by legislation. It may be that the evils in the existing situation should be left to the remedies afforded by the laws of trade. On the other hand,

it may be that the protection of the public from the operations of combinations of capital—especially those possessing the element of oppression—requires some measure of governmental intervention.  It may be that the present anti-trust statute should be amended and made applicable only to those combinations which unreasonably restrain trade—that it should draw a line between those combinations which work for good and those which work for evil.  But these are all legislative, and not judicial, questions.  It cannot be too clearly borne in mind that this court has nothing to do with the wisdom, justice, or expediency of the statute.  Equally true is it that this court, in applying the statute, must follow the decisions of the Supreme Court.  If the decisions of that court have been too broad, it is for that court alone to modify them.  The only right and duty of this court is to take the statute as it finds it, and, as it finds it, apply it in accordance with the interpretation placed upon it by the highest judicial tribunal. That this course may lead to results believed by many persons to be prejudicial to the public welfare cannot affect our action.  This court can neither refuse to enforce a constitutional act of Congress nor ignore the decisions of the Supreme Court of the United States.

In approaching the consideration of the legal questions involved in this case, the inquiry of primary importance is met at the threshold: Are the defendants so engaged in interstate commerce that they are amenable to federal laws?  Only in case they are so engaged is the consideration of other questions necessary.  The examination of this fundamental question may well proceed upon the theory that the allegations of the petition are true—that the defendants have combined, and by combining have obtained practical control of the tobacco industry of the country.  However comprehensive or oppressive the combination may be, unless it affect interstate commerce, it is not subject to the federal anti-trust statute.

There are many definitions of interstate commerce.  This from Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 203, 5 Sup. Ct. 826, 828, 29 L. Ed. 158, has been repeatedly approved:

"Commerce among the states consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale, and exchange of commodities."

The inquiry, then, is whether the record here shows "traffic" between citizens of different states, or the "purchase, sale, and exchange of commodities" across state lines.

The testimony discloses that the business of the defendants has three broad phases: (1) The purchase of the raw materials and supplies.  (2) The manufacture of the product.  (3) The disposition of the product.  While the second phase—that of manufacture—does not involve interstate commerce, the other two phases seem clearly to directly involve it; and it also seems clear that the three phases are of equal importance.  Unlike a mere manufacturing combination, this combination relates quite as much to the purchase of materials and the disposition of the product as to manufacture.

Leaf tobacco is purchased by the defendants' agents in tobacco mar-

kets, or directly from the grower in many different states, and is shipped by means of common carriers to factories or warehouses in other states. Licorice root for making licorice paste—necessary in producing certain kinds of tobacco—is purchased by a subsidiary corporation in foreign countries and is shipped to factories in this country. The paste, when manufactured, is sold to other of the defendants and is shipped to factories in different states. A subsidiary corporation manufactures tin foil and sells and ships it to the different factories. Another does the same thing with boxes, and another with cotton bags. Still another acts strictly as a purchasing corporation, and buys supplies in many markets, and sells and delivers them to the factories, warehouses, and offices throughout the country. The record shows constant intercommunication between the members of the combination in different states and constant shipments across state lines from one member to another as vendor and vendee.

The tobacco products manufactured by the defendants are largely sold by traveling salesmen, who solicit orders which, in most instances, are filled by shipping the goods ordered, by means of common carriers, from factories or warehouses located in states other than those in which the orders are taken. A limited number of jobbers in different states are also controlled, as well as an important retailer operating in different states. The business of the defendants covers the whole of the United States and the disposition of their products is effected under the supervision of an office of central authority by constant interstate shipments of the different commodities from factory, warehouse, or branch, to jobber, retailer, or consumer.

These facts seem clearly to show traffic between citizens of different states, and the purchase, sale, and exchange of commodities across state lines—to show that the defendants are directly engaged in commerce among the states and are subject to the federal anti-trust statute; and, as a practical matter, it is probable that a large part of the interstate shipments of the country are made by industrial combinations similar to that of the defendants. "Transactions between manufacturing companies in one state, through agents, with citizens of another, constitute a large part of interstate commerce." Caldwell v. North Carolina, 187 U. S. 622, 632, 23 Sup. Ct. 229, 233 (47 L. Ed. 336). If these corporations are not so engaged in interstate commerce as to be subject to federal regulation, then Congress, under the commerce clause, has little power except over carriers.

A point is made that this combination did not engage in interstate commerce in respect of sales made by traveling salesmen, because the title to the goods sold passed to the consignee when delivery was made to the common carrier in the place of manufacture. But the defendants engaged in interstate commerce when they sent their salesmen into different states and accepted and filled the orders obtained. "The negotiation of sales of goods, which are in another state, for the purpose of introducing them into the state in which the negotiation is made, is interstate commerce." Robbins v. Shelby Taxing District, 120 U. S. 489, 497, 7 Sup. Ct. 592, 596, 30 L. Ed. 694. The sale of goods, by sample or otherwise, in one state by a traveling salesman em-

ployed by a manufacturer located in another state, and their subsequent shipment from the latter to the former state, constitute commerce among the states, with which Congress alone has power to deal. The Supreme Court of the United States has repeatedly held that state laws taxing or imposing conditions upon such sales are unconstitutional, as trenching upon the powers of Congress. Thus the court, in Robbins v. Shelby Taxing District, supra, said:

"If the selling of goods by sample and the employment of drummers for that purpose injuriously affect the local interest of the state, Congress, if applied to, will undoubtedly make such reasonable regulations as the case may demand. And Congress alone can do it; for it is obvious that such regulations should be based on a uniform system applicable to the whole country, and not left to the varied, discordant, or retaliatory enactments of 40 different states. The confusion into which the commerce of the country would be thrown by being subject to state legislation on this subject would be but a repetition of the disorder which prevailed under the Articles of Confederation."

See, also, Brennan v. Titusville, 153 U. S. 289, 14 Sup. Ct. 829, 38 L. Ed. 719; Asher v. Texas, 128 U. S. 129, 9 Sup. Ct. 1, 32 L. Ed. 368; Caldwell v. North Carolina, 187 U. S. 622, 23 Sup. Ct. 229, 47 L. Ed. 336; Rearick v. Pennsylvania, 203 U. S. 507, 27 Sup. Ct. 159, 51 L. Ed. 295.

Where the title to the goods sold by the salesmen technically passes cannot, therefore, be regarded as important, "commerce among the states is a practical conception, not drawn from the 'witty diversities' (Yelv. 33) of the law of sales" (Rearick v. Pennsylvania, supra). Moreover, the facts bring the case within the language of Swift v. United States, 196 U. S. 375, 399, 25 Sup. Ct. 276, 280, 49 L. Ed. 518:

"But the allegations of the second section, even if they import a technical passing of title at the slaughtering places, also import that the sales are to persons in other states, and that the shipments to other states are part of the transaction—'pursuant to such sales'—and the third section imports that the same things which are sent to agents are sold by them, and sufficiently indicates that some at least of the sales are of the original packages. Moreover, the sales are by persons in one state to persons in another."

But still, if the technicality is important, the record shows, as we have seen, continued shipments of raw materials and finished products across state lines from one constituent corporation to another—constant purchases of materials, supplies, and products. If the combination as a shipper is not directly engaged in interstate commerce, then as a consignee it is so engaged, and the same result is reached.

Assuming, however, that these defendants are not directly engaged in interstate commerce, and are thus beyond the reach of the federal statute, what is the situation? Simply this: That there is no power—state or national—of practical efficiency which can reach industrial combinations, no matter how oppressive they may be. The result necessarily follows from the operation of the commerce clause of the Constitution. As we have just seen, the Supreme Court has held that state laws imposing conditions upon the sale of goods to be shipped into a state by a foreign vendor are unconstitutional, as trenching upon the powers of Congress. If such a sale is interstate commerce to the extent that it is free from local regulation, and yet the combination mak-

ing it is not so directly engaged in interstate commerce as to be subject to federal control, then there is a hiatus in power which leaves the combination above the law.

The business of a producing combination, in so far as it affects states other than those in which its plants are located, consists in the sale and delivery of its products. If it may sell its goods by shipment across state lines free from local laws, it may freely do business in states with whose laws and policy it is wholly antagonistic. The police power could not be extended to reach it. Inspection laws and statutes regulating the sale of injurious articles would be ineffective. Such a combination might locate its factory over the boundary line of a state, and, operating from there, adopt the most oppressive tactics to stifle local competition. If the commerce clause ties the hands of the states, and yet fails to give Congress efficient power, its effect is to force upon the whole country the standard of the state which charters the combination or of that in which its plants are located—standards which, as limiting the power of the combination, might impose no limitation at all.

I cannot accept this conclusion. In my opinion that which the Constitution took from the states it gave to the nation. There was no loss of power in the transmission. There is no middle ground. The business of the defendants in selling their goods and buying their materials, involving interstate dealings not subject to state anti-trust statutes, is interstate commerce, subject to the federal anti-trust statute.

But it is contended that the question whether the defendants are directly engaged in interstate commerce is settled by the decision of the Supreme Court in United States v. E. C. Knight Company, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325. I do not so regard the effect of that decision. As I view it, the opinion of the majority of the court turned upon the distinction between manufacture and commerce, and treated the case as one relating solely to manufacture within a single state. As said by the court (page 17 of 156 U. S., page 255 of 15 Sup. Ct. [39 L. Ed. 325]):

"What the law struck at was combinations, contracts, and conspiracies to monopolize trade and commerce among the several states or with foreign nations; but the contracts and acts of the defendants related exclusively to the acquisition of the Philadelphia refineries and the business of sugar refining in Pennsylvania, and bore no direct relation to commerce between the states or with foreign nations. The object was manifestly private gain in the manufacture of the commodity, but not through the control of interstate or foreign commerce."

The object of the proceedings in that case was, not to reach the American Sugar Refining Company as an unlawful combination, but to prevent the acquisition by it of local manufacturing properties. It is true that it appeared, incidentally, that the article manufactured was intended for transportation beyond the state; but no combination relating either to the purchase and interstate shipment of raw materials or to the disposition of the finished product was shown. Upon the facts shown in this record the principles of the Addyston Pipe Case (175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136) rather than those of the Knight Case, seem applicable.

These defendants are not a combination relating solely to manufacture, nor solely of manufacturers. As already shown, the combination embraces dealers as well as manufacturers, and producers of materials and supplies as well as of the finished tobacco products. The language of the Supreme Court in Montague & Co. v. Lowry, 193 U. S. 38, 47, 24 Sup. Ct. 307, 310, 48 L. Ed. 608, distinguishing the Knight Case, is applicable:

"It was not a combination or monopoly among manufacturers simply, but one between them and dealers in the manufactured article, which was an article of commerce between the states. United States v. E. C. Knight Company, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, did not, therefore cover it."

Furthermore, the recent decisions of the Supreme Court indicate that the Knight decision is inapplicable to a case like the present. Thus, in the Northern Securities Case, 193 U. S. 197, 329, 24 Sup. Ct. 436, 453, 48 L. Ed. 679, Mr. Justice Harlan said of the Knight decision:

"It was held that the agreement or arrangement there involved had reference only to the manufacture or production of sugar by those engaged in the alleged combination; but, if it had directly embraced interstate or international commerce, it would then have been covered by the anti-trust act and would have been illegal."

And in Swift v. United States, 196 U. S. 375, 397, 25 Sup. Ct. 276, 279, 49 L. Ed. 518, the court said:

"Although the combination alleged embraces restraint and monopoly of trade within a single state, its effect upon commerce among the states is not accidental, secondary, remote, or merely probable. On the allegations of the bill the latter commerce no less, perhaps even more, than commerce within a single state, is an object of attack. * * * Moreover, it is a direct object. It is that for the sake of which the several specific acts and courses of conduct are done and adopted. Therefore the case is not like United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, where the subject-matter of the combination was manufacture and the direct object monopoly of manufacture within a state."

See, also, Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488.

In view of the world-wide business of these defendants, of the constant reaching out for new markets in new countries, of the many different industries in many different states involved, of the constant shipments of materials from state to state, and of the control of the disposition of the manufactured product, can it be said that the direct object of this vast combination—the dominating factor in the tobacco industry of the country—is the "monopoly of manufacture within a state"? I must answer this question in the negative. In my opinion the defendants are engaged in interstate commerce, and that which the combination directly affects is interstate commerce.

This conclusion ends the inquiry of the greatest moment in the case. It is of much importance to many people at the present time whether the defendants have entered into an unlawful combination. It is of the most momentous importance to all the people for all time whether the national government has power to reach industrial combinations dealing across state lines. Concede that the present statute goes too far. Concede, even, that no enactments are now necessary. Yet all must

agree that conditions may arise in the future requiring legislative action which shall be both uniform and effective. Congress alone could take such action, and if this case shall finally establish that the power exists in Congress to take it, then, regardless of all other results, it is a good thing for the future of this country that these proceedings were instituted.

Returning, now, to the charges against these defendants, and regarding it as settled that, if a combination or monopoly within the meaning of the anti-trust statute is shown, it directly affects interstate commerce, the next inquiry is whether such a combination or monopoly is established. In determining whether a combination, within the meaning of the statute, is shown, these propositions must be accepted as established by decisions of the Supreme Court of the United States:

(1) Every combination in restraint of interstate commerce, whether reasonable or unreasonable, is in violation of the statute. The present state of the law is thus summarized in the very recent case of Shawnee Compress Co. v. Anderson, 209 U. S. 423, 434, 28 Sup. Ct. 572, 575, 52 L. Ed. 865:

"And it has been decided that not only unreasonable, but all direct, restraint of trade are prohibited, the law being thereby distinguished from the common law."

See, also, United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679.

(2) Every combination restraining competition in interstate trade is a combination in restraint of interstate commerce. As said by Mr. Justice Harlan in the Northern Securities Case, 193 U. S. 197, 337, 24 Sup. Ct. 436, 457, 48 L. Ed. 679:

"To destroy or restrict free competition in interstate commerce was to restrain such commerce."

And as stated by the court in National Cotton Oil Co. v. Texas, 197 U. S. 115, 129, 25 Sup. Ct. 379, 382, 49 L. Ed. 689, in speaking of the purpose of the state and federal statutes against combination:

"According to them, competition, not combination, should be the law of trade. If there is evil in this, it should be accepted as less than that which may result from the unification of interests, and the power such unification gives."

This construction of the statute confines the duty of this court in applying it within very narrow limits. We have only to inquire whether the evidence shows a combination restraining competition. There is no necessity for going further. Other inquiries are immaterial. The combination may not reduce the prices paid to the growers of raw materials, may not increase the prices charged to consumers, may not seek to exclude all others from the field, may be free from coercion or oppression, and yet if it restrict competition, if it restrain trade, reasonably or unreasonably, it falls within the statute. The statute declares unlawful every combination in restraint of trade. It contains no words of limitation or qualification, and the Supreme Court of the

United States has decided that the courts have no right to attach them to it.

In looking through the record for a combination which restricts competition, it is not necessary to go far. The defendants, in their own statement of that which they have done, present such a combination. In their brief (page 132) they say that their actions fall into two classes, of which the following is the first:

"The consolidation of interests, more or less sharply competitive, through the formation of a corporation and the transfer to it of the respective properties and business of such competitors."

A consolidation of competitive interests in this form, when a combination, as distinguished from a sale, is a combination which, restraining interstate commerce, violates the federal anti-trust statute. Whether a transaction amounts to a sale or to a combination depends upon whether the vendor parts with all interests in the business sold or merely changes the form of his investment. A bona fide sale of a plant for cash or its equivalent possesses none of the elements of combination. An exchange of one plant for an interest in united plants possesses all the elements of combination. See Davis v. A. Booth & Co., 131 Fed. 37, 65 C. C. A. 269; Bigelow v. Calumet, etc., Mining Co. (C. C.) 155 Fed. 869; also, upon the underlying principle involved, Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865, and the Northern Securities Case, supra.

The testimony in this case shows repeated instances where, upon the transfer of a competing business, the vendors merely changed the form of their investment. They transferred their property and received in exchange stock in the transferee corporation. They exchanged large interests in a small property for small interests in a large property. Instead of standing by themselves, they combined, and, in combining, violated the federal statute.

There is no especial merit in the corporate form of combination. A corporation without statutory authority—express or incidental—to acquire property cannot take it at all. With such authority it has only the power which an individual enjoys of natural right. Both may purchase and otherwise acquire property for lawful purposes; but neither can acquire property for a purpose forbidden by law. The corporations formed by the defendants, with the ordinary power to acquire all kinds of property, had no right to acquire property in order to form an unlawful combination. The grant of power would not be construed as authorizing any such acquisition; and any grant which went further, and did attempt to authorize the formation of a combination in violation of the federal statute, would be wholly void. No state can authorize any individual or corporation to break a law of the United States. See the Northern Securities Case, supra. Upon the defendants' own presentation of their acts, therefore, I cannot avoid the conclusion that they have, with certain exceptions, engaged in a combination contrary to the first section of the federal anti-trust statute.

In thus considering whether the defendants have combined in violation of the first section of the act, they have been treated as an asso-

ciation of corporations and individuals. But they are all dominated by the American Tobacco Company, and, in determining whether a monopoly has been created in contravention of the second section, they may properly be considered as a unit. In pursuing the latter inquiry, however, it is not necessary to go far. The violation of the first section requires the issuance of an injunction. No further relief could be granted, should the defendants be held to also violate the second section. The question of monopoly is, however, fully presented upon the briefs, and I think should not be passed over.

It appears from the record that the defendants produce 70 per cent. of the smoking tobacco made in this country, 73 per cent. of the cigarettes, 81 per cent. of the plug and twist tobacco, 81 per cent. of the fine-cut tobacco, 89 per cent. of the little cigars, and 96 per cent. of the snuff. They also make 95 per cent. of the licorice paste produced, 75 per cent. of the tin foil, and most of the tobacco extracts, boxes, and containers.

The acquisition by the defendants in taking over the various competing plants of most of the well-established and popular brands of tobacco gives them especial power to control the market. As pointed out in the defendants' brief:

"The difficulties of establishing a brand of tobacco are numerous, but they are compensated by the value of the brand when established."

The consumer becomes accustomed to, and buys by, a brand. It is difficult to induce him to purchase another brand. "His habit is a 'Bull Durham' habit, and not a mere tobacco habit."

The defendants purchase the major part of all the tobacco leaf—other than that used for cigars—raised in this country. Of some important types they buy a very large proportion of the total production. Thus of burley, used in the manufacture of plug tobacco, they bought in 1905 175,000,000 pounds out of a total crop of 240,000,000 pounds; of Virginia sun cured, used for chewing tobacco, they bought 7,400,-000 pounds out of a crop of 8,100,000 pounds. The hold of the defendants upon the tobacco industry of the country has steadily increased since the formation of the combination. There is only one branch of the industry which they do not have within their grasp—the cigar branch; but their predominating interest in all of the other branches is not lessened by the fact that they have not as yet obtained control of this branch. To create a monopoly, it is not necessary to gather in all the branches of a great industry.

In view of these facts, and of the further fact that the assets of the defendants amount to hundreds of millions of dollars, let us, with respect to the question whether they are monopolizing trade, again test their position from their own point of view. In examining the second section of the act the defendants in their brief (page 172) say:

"The sole question is: Do the defendants so engross the market that they can prevent others from engaging therein freely, and thus at pleasure fix the prices either of the raw materials or of the manufactured article?"

The record shows that, to establish and popularize a brand of tobacco, the expenditure of much time and money is necessary. Whether a person of moderate capital could successfully engage in the

manufacture of tobacco would depend entirely upon the position taken by the defendants. They might suffer him to succeed. On the other hand, they might deem it expedient to crush him, and, if they exercised the power which they possess, there could be but one result. Considering the enormous inherent and collateral power of the defendants, the record is remarkably free from acts of oppression or coercion. But still there is enough to show how a competitor can be brought to terms if occasion demands. The letters between the defendants' officials point out most effective means for entering "upon a vigorous campaign, to be kept up until the desired end is accomplished."

Under these conditions, I am of the opinion—in answer to the first phase of the defendants' question—that the defendants do so engross the tobacco market that they have power "to prevent others from engaging therein freely." The extent to which they have exercised their power is immaterial. The question presented by the defendants' inquiry is one of the existence of power, not its exercise.

Subject to the economic limit that prices cannot be fixed so low as to deprive the grower of inducement to raise future crops, the extent of the defendants' purchases of tobacco leaf necessarily gives them large power to fix the prices to be paid for the types which they require. Prices may be regulated—as the defendants assert—by the law of supply and demand; but the difficulty here is that the demand for many types comes, practically, from only one source. To whom, for example, can the growers of burley or Virginia sun-cured tobacco sell their crop, if they refuse the prices offered by the defendants? Similarly, the production by the defendants of by far the greater part of the tobacco used in this country gives the power to control the prices of the manufactured article, subject to the economic ·limit that, if placed too high, the consumer will give up the use of tobacco. It is not a question of going to another producer. No other producer could supply the amount required. Where will the users of snuff obtain it, if they are unwilling to pay the prices charged by the defendants?

Moreover, the defendants possess an even greater power over the prices of raw materials and finished products than the statistics which we have noticed indicate. It is apparent from the record that they are the dominating factors in the tobacco industry. Other producers are scattered and do not act together. They are not in a position to initiate price making.

They must follow the action of the defendants. Upon these facts, I am of the opinion that the second phase of the defendants' inquiry must, like the first, be answered in the affirmative—that the defendants do have power to determine the prices of raw materials and of the manufactured article.

Thus, applying to the defendants' position the test of their own inquiry, it follows that they constitute a monopoly. And the same result is reached if it be sought to bring them within the description of a monopoly stated by Mr. Justice McKenna in National Cotton Oil Co. v. Texas, 197 U. S. 129, 25 Sup. Ct. 382, 49 L. Ed. 689:

"Its dominant thought now is, to quote another, 'the motion of exclusiveness or unity'; in other words, the suppression of competition by the unifica-

tion of interest or management, or, it may be, through agreement and concert of action. And the purpose is so definitely the control of prices that monopoly has been defined to be 'unified tactics with regard to prices.' It is the power to control prices which makes the inducement of combinations and their profit. It is such power that makes it the concern of the law to prohibit or limit them."

Still another test brings us to the same conclusion. The authorities warrant the statement that a monopoly, in the modern sense, is created when, as a result of efforts to that end, previously competing businesses are so concentrated in the hands of a single person or corporation, or a few persons or corporations acting together, that they have power to practically control the prices of commodities and thus to practically suppress competition. National Cotton Oil Co. v. Texas, supra; United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; Swift v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; American Biscuit, etc., Co. v. Klotz (C. C.) 44 Fed. 724; United States v. Chesapeake, etc., Fuel Co. (C. C.) 105 Fed. 104; Chesapeake & O. Fuel Co. v. United States, 115 Fed. 610, 53 C. C. A. 256; People v. North River Sugar Refining Co., 54 Hun, 377, note, 3 N. Y. Supp. 401, 2 L. R. A. 33; Pocahontas Coke Co. v. Powhatan Coal, etc., Co., 60 W. Va. 508, 56 S. E. 264, 10 L. R. A. (N. S.) 268, 116 Am. St. Rep. 901; Richardson v. Buhl, 77 Mich. 658, 43 N. W. 1102, 6 L. R. A. 457; Harding v. American Glucose Co., 182 Ill. 615, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. Rep. 189; Herriman v. Menzies, 115 Cal. 16, 44 Pac. 660, 46 Pac. 730, 35 L. R. A. 318, 56 Am. St. Rep. 81; Lough v. Outenbridge, 143 N. Y. 271, 38 N. E. 292, 25 L. R. A. 674, 42 Am. St. Rep. 712; Wood v. Greenwood Hardware Co., 75 S. C. 383, 55 S. E. 973, 9 L. R. A. (N. S,) 501. And the examination of facts already made shows this concentration of power in the hands of the defendants.

It must be noted that the authorities hold that the material consideration, in determining whether a monopoly exists, is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so. The validity of an organization, according to the authorities—

"Is not to be tested by what has been done under it, but by what may be done under it; not by its performance, but by its power of performance when fully exercised." Pocahontas Coke Co. v. Powhatan Coal, etc., Co., supra.

Following the authorities, the necessary result is that the defendants, in possessing the power of control over the tobacco market, monopolize interstate trade and commerce within the meaning and in violation of the second section of the statute. And yet, in view of the possible results from this interpretation of the statute, I could only with hesitation unqualifiedly adopt it. An aggregation of capital or property, with power to control the market for a product, might be brought about by lawful means without the element of combination, and might carry on its operations without the element of oppression. If the mere possession of power is the test of legality, then the inquiry in that case, as in any other case, would merely relate to the present status of the aggregation: What has it power to do?—with-

out regard to its past history or its present methods. Thus a result might be declared unlawful, which was obtained by lawful means; an aggregation of capital criminal, which actually operated to the public benefit. The law that illegality depends wholly upon the power of performance may be settled; but it was not settled when the tendency towards the unification of interests was so marked as at the present time. It may be that now, in applying the second section of the statute, performance, as well as power of performance, should be considered; that the elements of oppression and coercion should be shown to exist, to establish an unlawful monopoly. And, if these elements are to be considered, they are not sufficiently presented upon this record. It is not shown that the defendants have reduced prices to growers, nor that they have raised prices to consumers. The instances of coercion which are shown appear rather as incidental to the development of a great business than as indicative of a policy of oppression. But a judicial opinion upon the important question whether the conclusion which the authorities lead to should be adopted without qualification in construing and applying the second section should only be expressed when necessary to the rendition of a decision. There is no such necessity in this case. In view of the opinions of the other members of the court, the decree must run against the defendants under the first, and not under the second, section of the statute. Therefore, while I have felt it my duty to examine the situation under the second section, its consideration need not be carried further.

The only matters remaining relate to the decree. While not wholly adopting the views of Judges LACOMBE and COXE with respect to certain of the defendants, I concur in the results which they reach, and in their conclusion that an injunction of the nature stated should be issued against the defendants, with the exceptions noted, but with stay pending appeal.

WARD, Circuit Judge (dissenting). I feel constrained to dissent from the judgment of the court in this case. The United States charges in its bill that the defendants have been and are engaged in an illegal combination to restrain and monopolize trade, in violation of an act of Congress passed July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]) known as the "Sherman Act," and prays for relief by injunction and otherwise. An outline of the acts complained of as evidencing a combination in restraint of trade and a monopoly is as follows:

In January, 1890, the American Tobacco Company was incorporated, to take over the business of five independent concerns engaged almost wholly in the manufacture of cigarettes. This company substantially covered the entire output of cigarettes in the United States. It is no defense that it was incorporated some six months before the passage of the Sherman act, if an illegal combination within the meaning of that act. United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007. There is no evidence that the combination was the result of cutting of prices or of a commercial war of any kind. The company from time to time bought

other plants engaged in manufacturing smoking tobacco and others engaged in manufacturing plug tobacco.

In 1898 the Continental Tobacco Company was incorporated, to take over the plug tobacco business of the American Tobacco Company and the business of five other independent concerns manufacturing principally plug tobacco. There had been a war in the way of cutting of prices in certain brands of plug tobacco, which probably had something to do with the formation of it. Subsequently the American Tobacco Company bought or obtained control of many plants engaged in the manufacture of smoking tobacco, and the Continental many plants engaged in the manufacture of plug tobacco. Some of them were absorbed, and others, like the defendants, continued their corporate existence.

In 1900 the American Snuff Company was incorporated, to take over the snuff business of the American Tobacco Company, of the Continental Tobacco Company, and of two other independent manufacturers.

In 1901 the American Cigar Company was incorporated, to take over the business of the American Tobacco Company and of Powell, Smith & Co. in manufacturing and selling cigars, cheroots, and stogies. In the same year the Consolidated Tobacco Company was incorporated, to take over as a holding company, in exchange for its bonds, substantially all of the stock of the American Tobacco Company and the Continental Tobacco Company.

In 1903 the American Stogie Company was incorporated, to take over the stogie business of the American Cigar Company, the American Tobacco Company, and the Continental Tobacco Company. In 1904 the American Tobacco Company, the Continental Tobacco Company, and the Consolidated Tobacco Company were merged into the present American Tobacco Company.

The companies above named, being the principal defendants, acquired control of the plants of many other concerns engaged in manufacturing or distributing tobacco, and also of concerns supplying things necessary in the tobacco business, such as tin foil, licorice root, and its products, bags, boxes, signs, and briar pipes. Most of the vendors of the tobacco plants entered into contracts not to engage in the business sold in certain territory for a certain time, which I regard as proper for the protection of the vendees.

Referring to the combination of 1904, which created the present American Tobacco Company, it is to be remembered that the Consolidated Company was a mere holding company, and the American Tobacco Company and the Continental Tobacco Company were in no sense competitors; the former being engaged in manufacturing cigarettes and smoking tobacco, and the latter in manufacturing plug and twist tobacco. Their merger was not in restraint of trade, unless it could be regarded as an illegal monopoly, because it produced from 60 to 90 per cent. of the total output of the United States of the various articles it manufactured. The profits of the present American Tobacco Company and its controlled companies have been and are very large, and their business, excluding cigars, covers not less than

75 per cent. of the whole output of manufactured tobacco in the United States.

The government has offered in evidence a stipulation (Government's Exhibit No. 8) of all the defendants, except the Imperial Tobacco Company, the United Cigar Stores Company, R. L. Richardson Company, Incorporated, and W. C. Reed, which must be taken correctly to describe the way the business is done, there being nothing in the record to the contrary, as follows:

"We admit that all the vendors and corporation defendants mentioned in the petition as engaged in the manufacture and sale of tobacco products, except Imperial Tobacco Company, Limited, purchased or now purchases some or all of the requisite raw material in states or countries other than those in which the factories were or are located, and had or has it transported thence through the medium of common carriers to said factories, and employed or employ traveling salesmen, who solicited or solicit in states or countries other than those in which the factory was or is located orders for the tobacco products, which by them were or are transmitted to said factory or other chief office of the manufacturer, and, if approved, they are filled by the delivery of the goods to a common carrier where the factory was or is located, duly consigned to the purchaser; title passing to said purchaser on said delivery to the common carrier."

It can hardly be doubted that a manufacturer who makes his product of materials found within the state of manufacture and sells his entire product there is not engaged in interstate commerce. It will make no difference that the purchasers send and sell the manufacturer's product throughout the United States. Except that they buy their raw material in other states, this is the way the manufacturing defendants in this case do their business. Their business is manufacturing, and the fact that they get their raw material in other states and send agents to other states to solicit orders does not make their business interstate commerce. This certainly appears to be the view of the Supreme Court in the case of United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325. In it the American Sugar Refining Company and four refineries in Philadelphia were all engaged in competition with each other in the importing of raw sugar into the United States, refining it, and selling it throughout the country. Their business was exactly like that of the principal defendants, except that it was in a necessary of life, instead of a luxury. A combination was made between the American Sugar Refining Company and the Pennsylvania refineries by the exchange of all their capital stock for shares of its capital stock. The monopoly was greater than in the case now under consideration, because the combination manufactured 98 per cent. of the entire sugar output of the United States. The bill averred that the American Sugar Refining Company monopolized the manufacture and sale of refined sugar in the United States, controlled its price, and had combined with the other defendants to restrain the commerce in refined sugar in the several states and foreign nations and to increase its price. The trial court (60 Fed. 306) found that:

"The object in purchasing the Philadelphia refineries was to obtain a greater influence or more perfect control over the business of refining and selling sugar in this country."

When the case reached the United States Supreme Court, Chief Justice Fuller, who delivered the opinion of the court, assumed that the transaction did constitute a monopoly, but held that it was a monopoly of the manufacture of a necessary of life. He said, at page 17 of 156 U. S., and page 255 of 15 Sup. Ct. (39 L. Ed. 325):

"The object was manifestly private gain in the manufacture of the commodity, but not through the control of interstate or foreign commerce. It is true that the bill alleged that the products of these refineries were sold and distributed among the several states, and that all the companies were engaged in trade or commerce with the several states and with foreign nations; but this was no more than to say that trade and commerce served manufacture to fulfill its function. Sugar was refined for sale, and sales were probably made at Philadelphia for consumption, and undoubtedly for resale by the first purchasers throughout Pennsylvania and other states, and refined sugar was also forwarded by the companies to other states for sale. Nevertheless it does not follow that an attempt to monopolize, or the actual monopoly of, the manufacture was an attempt, whether executory or consummated, to monopolize commerce, even though, in order to dispose of the product, the instrumentality of commerce was necessarily invoked. There was nothing in the proofs to indicate any intention to put a restraint upon trade or commerce; and the fact as we have seen that trade or commerce might be indirectly affected was not enough to entitle complainants to a decree. The subject-matter of the sale was shares of manufacturing stock, and the relief sought was the surrender of property which had already passed and the suppression of the alleged monopoly in manufacture by the restoration of the status quo before the transfers; yet the act of Congress only authorized the Circuit Courts to proceed by way of preventing and restraining violations of the act in respect of contracts, combinations, or conspiracies in restraint of interstate or international trade or commerce."

It is clear that the court recognized that the business of the defendants, though manufacturing, did incidentally, and not directly, embrace interstate commerce. If this fact sufficed to bring them within the Sherman act, then almost every occupation may be regulated by Congress. The dissenting opinion of Harlan, J., proceeded principally upon the theory that the combination was necessarily one relating to the sale of goods, and raised every objection now relied upon by the government to the conclusion of the court.

The majority of the court think that subsequent decisions, especially Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, have impliedly overruled the Knight Case. In no subsequent decision has it been expressly qualified, and in the Loewe Case Chief Justice Fuller, delivering the unanimous opinion of the court, said at page 279 of 208 U. S., and page 304 of 28 Sup. Ct. (52 L. Ed. 488):

"We do not pause to comment on such cases as United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290; and Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300, in which the undisputed facts showed that the purpose of the agreement was not to obstruct or restrain interstate commerce. The object and intent of the combination determined its legality."

It has been suggested that the plaintiffs in the Loewe Case must have been held by the court to have been directly engaged in interstate commerce, or otherwise the demurrer would not have been overruled, and, if they were directly engaged in interstate commerce, the defendants in the Knight Case must have been so also; the only difference being that one manufactured sugar and the other manufactur-

ed hats. But one need not be engaged in interstate commerce at all to get the benefit of the Sherman act. Section 7 authorizes "any person who shall be injured in his business or property" by a violation of the act to bring just such a suit as Loewe brought. Although the plaintiffs, as manufacturers, might not have been engaged in business which would bring them within the operation of the Sherman act, still a combination of third parties to restrain a part of their business incidentally embraced in interstate commerce might well bring that combination within the operation of the act. The decision in the Loewe Case was unanimous, and, expressly approving the Knight Case, proceeded upon the ground that the defendants' combination necessarily and directly restrained the purchases and sales of hats between the plaintiffs and citizens of other states. Chief Justice Fuller delivered the opinion in both cases. Three of the justices who were of the majority in the Knight Case concurred in the Loewe Case, and it can hardly be supposed that they were overruling the Knight Case by implication.

I think it conclusive in this case. If it be said this conclusion would leave great evils without correction, the answer is they may be corrected by the states or in the territories by the United States, because they can prevent monopolies and combinations in restraint of trade within their own borders, whether carried on by their own citizens or by others.

Assuming, however, that the Knight Case does not apply, are the defendants within the prohibition of the first section of the Sherman act? Undoubtedly the original American Tobacco Company and the Continental Tobacco Company (both of which have ceased to exist) and the American Snuff Company and the American Cigar Company were combinations of independent concerns; but every combination is obviously not within the act. The prohibition is against combinations whose purpose is to restrain trade. Such a combination is within the act, even if it fail to do so; while one whose purpose is not to restrain trade is not within the act, even if it incidentally does so. Intention is of prime importance, because the acts prohibited are made crimes. So far as the volume of trade in tobacco is concerned, the proofs show that it has enormously increased from the raw material to the manufactured product since the combinations, and, so far as the price of the product is concerned, that it has not been increased to the consumer and has varied only as the price of the raw material of leaf tobacco has varied.

The purpose of the combinations was not to restrain trade or prevent competition, although competition was incidentally prevented, but, by intelligent economies, to increase the volume and the profits of the business in which the parties were engaged. No agreements were entered into, as in many of the decided cases, that operated directly on interstate commerce through common carriers by maintaining rates or preventing competition, like United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259, and Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, or which limited output of

manufacturers or regulated the prices at or the territory within which their output should be sold throughout the United States, as in Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, Montague & Co. v. Lowrey, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, and Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, or which sought to prevent any interstate commerce at all in the goods in question, as in Loewe v. Lawlor. 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 188.

The case of Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865, on which the government relies, throws little light on the one under consideration. It was an appeal from the Supreme Court of the territory of Oklahoma, which court found as a fact that the lease in question was made in aid of a conspiracy to suppress competition and secure a monopoly. There is nothing to show whether the court was relying upon the common law, the trust act of the territory, or the Sherman act. The Supreme Court felt itself confined to determining whether there was evidence to support the conclusion of the territorial court, and, finding that there was, affirmed the decree, Mr. Justice McKenna said, referring to the trial court:

"The court further said that it found 'ample authority in the record for that action,' and, following the rule 'often reiterated,' the court further said 'it must hold that, where a record contains some evidence to support the finding of the trial court,' the judgment will not be disturbed. The ruling sustaining the power of the Shawnee Company to execute the lease is attacked by appellees, but we do not find it necessary to express an opinion upon it, on account of the view we entertain of the second proposition. In passing on the second proposition the Supreme Court decided adversely to the view taken by the trial court. The court, therefore, must either have conceded that there was not some evidence supporting the conclusions of fact of the trial court, or must have deemed the principles of law which the trial court upheld were not sustained by its conclusions of fact. As our view in the nature of things is confined to determining whether the court below erred, it follows that our reviewing power under the circumstances is coincident with the authority to review possessed by the court below, and therefore we are confined, as was the court below, to determining whether there was some evidence supporting the findings, and whether the facts found were adequate to sustain the legal conclusions. Southern Lumber Co. v. Ward, 208 U. S. 126, 28 Sup. Ct. 239, 52 L. Ed. 420."

It remains to inquire whether the American Tobacco Company and its controlled companies constitute a monopoly of or attempt to monopolize a part of the foreign commerce or commerce between the states under the second section of the Sherman act. As this section prohibits a monopoly of or an attempt to monopolize any part of such commerce, it cannot be literally construed. So applied, the act would prohibit commerce altogether. The first and second sections must be read together, and I think mean the same thing; the second adding nothing except to extend the prohibition to individuals who, without combination, monopolize or attempt to monopolize. It must be understood to prohibit monopolies or attempts to monopolize brought about by the unlawful means contemplated in the first section, viz., the purpose to restrain trade by preventing competition and preventing others from participating in it. The third section of the act bears out this

construction, because it does not mention monopolies or attempts to monopolize in the territories or District of Columbia, where the jurisdiction of the United States is supreme in all things, and it can hardly be that Congress intended to declare innocent acts committed within them which it pronounces crimes if committed in the states.

The purposes of the defendants should not be made to depend upon occasional illegal or oppressive acts or letters, but must be collected from their conduct as a whole. A perusal of the record satisfies me that their purposes and conduct were not illegal or oppressive, but that they strove, as every business man strives, to increase their business, and that their great success is a natural growth resulting from industry, intelligence, and economy, doubtless largely helped by the volume of business done and the great capital at command.

For these reasons, without considering others discussed by counsel, I think the bill should be dismissed. For final decree see 164 Fed. 1024.