UNITED STATES v. STANDARD OIL CO. OF NEW JERSEY et al.

(Circuit Court, E. D. Missouri, E. D.   November 20, 1909.)

No. 5,371.

1. COMMERCE (§ 3*)—ANTI-TRUST ACT—CONGRESSIONAL RESTRICTION OF USE OF CONTRACTS AND METHODS OF HOLDING TITLES TO RESTRAIN INTERSTATE COMMERCE AUTHORIZED BY CONSTITUTION.

Congress has power, under the commercial clause of the Constitution, to regulate and restrict the use, in commerce among the several states and with foreign nations, of contracts, of the method of holding title to property, and of every other instrumentality employed in that commerce, so far as it may be necessary to do so in order to prevent the restraint thereof denounced by Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 3; Dec. Dig. § 3.*]

2. MONOPOLIES (§ 12*)—ANTI-TRUST ACT—TEST OF LEGALITY OF COMBINATION ITS NECESSARY EFFECT UPON COMPETITION.

The test of the legality of a combination under this act is its necessary effect upon competition in commerce among the states or with foreign nations.

If its necessary effect is only incidentally or indirectly to restrict that competition, while its chief result is to foster the trade and increase the business of those who make and operate it, it does not violate that law.

But, if its necessary effect is to stifle or directly and substantially to restrict free competition in commerce among the states or with foreign nations, it is illegal within the meaning of that statute.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

3. MONOPOLIES (§ 12*) — ANTI-TRUST ACT — POWER TO RESTRICT. COMPETITION VESTED BY COMBINATION INDICATIVE OF ITS CHARACTER.

The power to restrict competition in commerce among the several states or with foreign nations, vested in a person or an association of persons by a combination, is indicative of the character of the combination, because it is to the interest of the parties that such a power should be exercised, and the presumption is that it will be.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

4. MONOPOLIES (§ 20*) — ANTI-TRUST ACT — COMBINATION IN ONE PERSON OF POWER OF MANY TO RESTRICT COMPETITION RENDERS THAT POWER MORE EFFECTIVE AND DURABLE.

The combination in a single corporation or person, by an exchange of stock, of the power of many stockholders holding the same proportions, respectively, of the majority of the stock of each of several corporations engaged in commerce in the same articles among the states or with foreign nations, to restrict competition therein, renders the power thus vested in the former greater, more easily exercised, more durable, and more effective than that previously held by the stockholders, and it is illegal.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

5. MONOPOLIES (§ 20*)—ANTI-TRUST ACT—COMBINATION RESTRICTING COMPETITION IN INTERSTATE COMMERCE BY EXCHANGE OF STOCK OF TRADING CORPORATIONS ILLEGAL—FACTS—CONCLUSION.

In 1899 the stockholders of the Standard Oil Company of New Jersey owned a majority of the stock of 19 other corporations in the same proportions that they owned the stock of the Standard Company, and those 20 corporations controlled, by the ownership, of the majority of their

For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
173 F.—12

stock or otherwise, many other corporations. Each of these corporations was engaged in some part of the business of producing, buying, refining, transporting, and selling petroleum and its products, and they were conducting about 30 per cent. of the production of the crude oil and more than 75 per cent. of the business of purchasing, refining, transporting, and selling petroleum and its products in this country. Many of them were engaged in commerce in these articles among the several states and with foreign nations, and were naturally competitive.

During the 10 years prior to 1879 the 7 individual defendants had acquired control of many corporations, partnerships, and refineries that had been competing in this business, had placed the majority of the stock of those corporations and the interests in property and business thus obtained in various trustees, to be held and operated by them for the stockholders of the Sandard Oil Company of Ohio, one of the 19 companies in which the individual defendants were principal stockholders, and had thereby suppressed competition among these corporations and partnerships. In 1879 they and their associates caused all the trustees to convey their interests in the stock, property, and business of all these corporations to 5 trustees, to be held, operated, and distributed by them for the stockholders of the Standard Company of Ohio. From 1879 until 1892 they prevented these corporations and others engaged in this business, of which they secured control, from competing in this commerce, by causing the control of their operations, and generally of a majority of their stocks, to be held in trust for the stockholders of the Standard Company of Ohio, and from 1892 until 1899 they accomplished the same result by a similar stockholding device and by the joint equitable ownership of the majority of the stocks of the corporations.

In the year 1899 the 7 individual defendants and their associates caused the majority of the stock of the 19 corporations to be transferred to the Standard Oil Company of New Jersey in exchange for its stock, so that the latter company thereby acquired the legal title to a majority of the stock of each of the 19 companies, the control of these companies and of all the companies which they controlled, and the power to fix the rates of transportation, and the purchase and selling prices of petroleum and its products, which all these corporations should pay and receive in the conduct of their business in commerce among the states and with foreign nations. Since that exchange of stock the 7 individual defendants have been and are stockholders and officers of the Standard Company of New Jersey, which has exercised, and is still using, that power, and by its use it has prevented, and is still preventing, competition in commerce among the states and with foreign nations among these corporations.

*Held*, the transaction constituted a combination and conspiracy in restraint of, and to monopolize, commerce among the states and with foreign nations, in violation of sections 1 and 2 of the anti-trust act of July 2, 1890 (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and the government is entitled to an injunction against the farther continuance and operation thereof.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

(Syllabus by the Court.)

In Equity. Bill by the United States against the Standard Oil Company of New Jersey and others. Decree for complainant.

See, also, 152 Fed. 290.

Frank B. Kellogg and Charles B. Morrison (The Attorney General, Cordenio A. Severance, J. Harwood Graves, and Guy Chase, on the brief), for the United States.

John G. Johnson, John G. Milburn, D. T. Watson, and Moritz Rosenthal (M. F. Elliott, Martin Carey, Frank L. Crawford, Chauncey W.

Martyn, Douglas Campbell, Walter F. Taylor, John M. Freeman, Ernest C. Irwin, and W. I. Lewis, on the brief), for defendants.

Before SANBORN, VAN DEVANTER, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge. This is a suit brought by the United States to enjoin the Standard Oil Company of New Jersey, a corporation, about 70 subsidiary corporations, and 7 individual defendants, from continuing an alleged illegal combination in restraint of commerce among the several states, in the District of Columbia, in the territories, and with foreign nations, in violation of the Sherman anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). The provisions of that act pertinent to the issues in this case are:

Section 1:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal."

Section 2:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor.'

Section 8:

"The word 'person' or 'persons' wherever used in this act shall be deemed to include corporations and associations."

Repeated discussion and consideration of the purpose and meaning of this act have established, by controlling authority, beyond debate in this tribunal, these pertinent rules for its interpretation and application to the facts of this case. The test of the legality of a contract or combination under this act is its direct and necessary effect upon competition in interstate or international commerce. If the necessary effect of a contract, combination, or conspiracy is to stifle, or directly and substantially to restrict, free competition in commerce among the states or with foreign nations, it is a contract, combination, or conspiracy in restraint of that trade, and it violates this law. The parties to it are presumed to intend the inevitable result of their acts, and neither their actual intent nor the reasonableness of the restraint imposed may withdraw it from the denunciation of the statute. Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 234, 20 Sup. Ct. 96, 44 L. Ed. 136; Northern Securities Company v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 48 L. Ed. 679; United States v. Joint Traffic Association, 171 U. S. 505, 577, 19 Sup. Ct. 25, 43 L. Ed. 259; Hopkins v. United States, 171 U. S. 579, 592, 19 Sup. Ct. 40, 43 L. Ed. 290.

The exchange of the stock or shares in the ownership of competitive corporations engaged in interstate or international commerce for stock or shares in the ownership of a single corporation, the necessary effect of which is a direct and substantial restriction of competition in that commerce, constitutes a combination in restraint of commerce among the states or with foreign nations that is declared illegal by this

law.   Northern Securities Company v. United States, 193 U. S. 197, 354, 366, 24 Sup. Ct. 436, 48 L. Ed. 679; United States v. American Tobacco Co. (C. C.) 164 Fed. 700, 718.

The business of the defendants is the production and the purchase of petroleum, its storage, its transportation from the producing wells to refineries, the refining of this oil, and the transportation and sale of its products to purchasers in this and other countries.   In 1865 John D. Rockefeller owned a refinery in Cleveland, Ohio.   He and Samuel Andrews formed the firm of Rockefeller & Andrews, which bought and operated this refinery.   In 1870 the successors of this firm, John D. Rockefeller, William Rockefeller, Samuel Andrews, Henry M. Flagler, and Stephen D. Harkness, owned two refineries, and had a domestic trade in oil at Cleveland and a warehousing business and an export trade at the port of New York, which they vested in the Standard Oil Company of Ohio, a corporation with a capital stock of $1,-000,000, which they then organized.   Betweeen the organization of that corporation in 1870 and April 8, 1879, Henry H. Rogers, John D. Archbold, Oliver H. Payne, and Charles M. Pratt associated themselves with the Rockefellers and Flagler and became stockholders in this corporation, and these 7 defendants and their associates increased the number of its stockholders to 37, its capital stock to $3,500,000, the value of its property to a much larger sum, and acquired for the stockholders of that corporation, by the purchase of property conveyed directly to it, by the exchange of its stock for stock of other corporations and for interests in partnerships, and by placing the title to the business and property obtained in new corporations organized to hold them, and then vesting the title to a majority of all of their stock in various individuals in trust for the stockholders of the Standard Oil Company, more than 40 competitive refineries located, respectively, in Cleveland, Pittsburg, Titusville, Parkersburg, Baltimore, Philadelphia, Bayonne, New York Harbor, Boston, and other places, and the ownership of the entire interest or of a controlling interest in more than 30 companies, some of which were corporations, while others were partnerships, engaged in the same general business.   The result was that on April 8, 1879, the stockholders of the Standard Oil Company were, by their holdings of stock and by their position as cestuis que trust, practically the owners of controlling interests in the property and the business of more than 30 companies engaged in the oil business, the title to which was held in trust for them by the Standard Oil Company and other trustees in proportion to their ownership of the stock of that corporation.   Thereupon on that day the Standard Oil Company and all the other trustees conveyed their interests in the stock, property, and business of these concerns to George H. Vilas, M. R. Keith, and George F. Chester, in trust, to hold and manage them for, and to divide and distribute them among, the 37 stockholders of the Standard Oil Company in proportion to their respective holdings of the stock of that company.   The trustees, however, did not divide or distribute, but operated the refineries and the companies which they held under this deed, and with their earnings purchased other property and the stock of other companies, until in 1882 they held in this trust property worth more than $55,000,000.

In January, 1882, the owners, as cestuis que trust and otherwise, of all this property, and the trustees, George H. Vilas, M. R. Keith, and George F. Chester, entered into a trust agreement to the effect that all the stocks they owned in the Standard Oil Company of Ohio and in all other corporations and limited partnerships engaged in the oil business, 39 of which were mentioned in the contract, were conveyed to 9 trustees during their lives and the life of the survivor of them and for 21 years thereafter, unless the trust was sooner dissolved by vote of the shareholders; that these trustees might organize other corporations to produce, manufacture, refine, and deal in petroleum and its products; that they might buy with the trust funds bonds or stocks of other companies engaged in similar or collateral business; that as stockholders of the various corporations they should elect the officers of those corporations; that they should issue and deliver, to each of the equitable owners of the stocks, bonds, and property held by them, trust certificates, which should show the value and extent of his interest in the trust in shares of the par value of $100 each; and that they should supervise the business of all the companies whose stock they held, collect the dividends upon the stock and the interest upon the bonds in their possession, and distribute the income thus derived in dividends upon the trust certificates. Six of the individual defendants were six of the nine trustees, and these trustees issued for the stocks, the title to which was thus conveyed to them, trust certificates of the par value of $70,000,000, and between 1882 and March 21, 1892, additional certificates of the par value of $27,250,000, so that on the latter date there were outstanding certificates for 972,500 shares in the trust.

In March, 1892, the Supreme Court of Ohio decided that the making and operation of this trust of 1882 were beyond the corporate powers of the Standard Oil Company of Ohio and tended to create a monopoly, and enjoined that corporation from continuing its operation. State v. Standard Oil Company, 49 Ohio St. 137, 30 N. E. 279, 291, 15 L. R. A. 145, 34 Am. St. Rep. 541. A few days later, on March 21, 1892, the holders of the trust certificates met and resolved that the trust agreement was terminated on that day, that the trustees should sell all the trust property except the stocks of companies held by them, and that these stocks should be distributed to the owners of the trust certificates, who then numbered several thousands, in proportion to their respective ownerships of shares in the trust. The trustees then held stocks in 84 companies. They first transferred the stocks they held in 23 of these companies to the Standard Oil Company of New Jersey, the stocks they held in 11 of these companies to the Standard Oil Company of New York, the stocks they held in 3 of these companies to the South Penn Oil Company, the stocks they held in 4 of them to the Forest Oil Company, the stocks they held in 2 of them to the Standard Oil Company of Indiana, the stocks they held in 4 of them to the Standard Oil Company of Kentucky, the stock they held in 1 of them to the Ohio Oil Company, the stocks they held in 3 of them to the Buckeye Pipe Line Company, the stocks they held in 2 of them to the National Transit Company, and the stocks they held in 11 of them to the Anglo-American Oil Company, so that they retained the stocks

of the 20 principal companies, and these 20 companies held the stocks in the 64 other companies.  There were outstanding trust certificates for 972,500 shares in this trust, and the owners of these certificates were the equitable owners of the stocks in all these companies.  The method of division and distribution of these stocks adopted by the trustees was this: They made to each holder of a trust certificate, upon his surrender of it, a single assignment of as many 972500ths of all the stocks held by them on July 1, 1892, in each and all of these companies as the holder of the trust certificate held shares in the trust. If he had one share, he received one assignment of $1/972500$ of all the stocks; and if he held 256,854 shares, he received $256854/972500$ of all the shares held in the trust.  But the receipt by the assignee of his share of the stock of any one of these companies was conditioned by the terms of the assignment upon his accepting his share of the stock of all of them.  This method of distribution appears to have deterred many of the holders of trust certificates from surrendering them and accepting their shares of the stocks.  The individual defendants, however, and their more intimate associates, surrendered their trust certificates and took sufficient shares of the stocks to aggregate a majority of the stock of each of the 20 companies and secured to themselves the control and management of all the companies in that way until the year 1899.

In that year the defendant the Standard Oil Company of New Jersey, a corporation, was one of the 20 companies.  The par value of its capital stock was $10,000,000.  Its charter was then so amended that it was empowered to do all kinds of mining, manufacturing, trading, and transportation business, to acquire, hold, vote, sell, and assign shares of capital stock, and to carry on its business in all parts of the world.  Its capital stock was increased to $100,000,000, and the stock of the other 19 companies was exchanged for the stock of the Standard Oil Company of New Jersey, so that the latter company succeeded to the legal title to the majority of the stock of the 19 companies, and thereby to the management and control of those companies and of all the companies which they controlled.  Henceforth in this discussion the Standard Oil Company of New Jersey will be called the "principal company," and the companies it then and thereafter controlled the "subsidiary companies."

Between 1899 and the filing of the bill in this case in November, 1906, the affairs of the principal company and of the subsidiary companies have been managed by the former as the business of a single person.  Subsidiary companies have come and gone at its bidding, but it still holds the control of more than 30 of the chief companies whose management was committed to it in 1899.  The par value of the capital stock of these companies in 1899 was about $100,000,000.  In 1908 it was more than $150,000,000.  Among them are 9 companies, the owners of 16 refineries, while the principal company has several, engaged in manufacturing illuminating oil and other products of petroleum, 12 transportation companies, the owners in 1899 of 10,749 and in 1908 of 45,227 miles of gathering pipe lines, and in 1899 of 3,904 and in 1908 of 9,338 miles of trunk pipe lines, capable of gathering from the

wells and pumping oil from Pennsylvania, Indiana, Kansas, and Oklahoma to the Atlantic seaboard and to the refineries, 6 marketing companies, which in 1906 had 3,574 selling stations scattered throughout the United States, and several producing companies.

The crude oil is transported from the oil fields to the refineries by pipe lines, and the products from the refineries and storage tanks to the selling stations by tank cars, and, when exported, by ships. From 1899 to 1907 the principal company and the subsidiary companies it has operated under this trust produced more than one-tenth of the crude oil obtained in this country, transported more than four-fifths of the petroleum derived from the Pennsylvania and Indiana oil fields, manufactured more than three-fourths of all the crude oil refined in the United States, owned and operated more than one-half of all the tank cars used to distribute its products, marketed more than four-fifths of all the illuminating oil sold in the United States, exported more than four-fifths of all the illuminating oil sent forth from the United States, sold more than four-fifths of all the naphtha sold in the United States, and sold more than nine-tenths of all the lubricating oil sold to railroad companies in the United States. The principal company, by means of this trust and the commanding volume of the oil business which it acquired thereby, secured, and it has since exercised and is using, the power to prevent competition between the companies it controls, to fix for them the purchase price of the crude oil, the rates for its transportation, and the selling prices of its products. It has prevented, and is preventing, any competition in interstate and international commerce in petroleum and its products between its subsidiary companies and between those companies and itself.

The United States charged in its bill that between 1869 and 1879 the 7 individual defendants conspired to restrain interstate and international commerce in petroleum and its products, that they combined with each other and with numerous corporations and partnerships named, and by the union of competing companies, by the trust of 1879, by the trust of 1882, and by the formation and operation of the stockholding trust of 1899, they have restrained and are still restraining that commerce. Attention is challenged to the fact that these defendants constitute only 7 of about 5,000 stockholders of the principal company and only 7 of its 15 directors, and that they own but little more than one-third of its stock, and it is contended that no adequate proof has been presented that they are, or were in 1906, when the bill was filed, controlling or directing the operations of the principal or subsidiary corporations, or operating the stockholding trust of 1899. But a third of the stock of a great corporation, when the remainder is scattered among thousands of followers, and 7 out of 15 friendly directors, may control a board of directors and a corporation; and evidence in this case, too voluminous for recitation or review, has convinced that prior to 1879 these 7 defendants combined to secure and obtained the control of companies competing in interstate commerce in oil and suppressed their competition, that they caused the formation and execution of the trusts of 1879 and 1882, that they directed and followed that unique method of distributing the stock held in the latter trust by which it was

not distributed to the majority of the stockholders for many years after 1892, while they and their associates held the control of it and of the corporations it commanded, that they caused the stockholding trust of 1899, and that by means of that trust they still hold the actual control and direction of the Standard Company and of its subsidiary corporations, and that since 1899 they have been and still are engaged in carrying into effect and executing that trust.

The acts of these and other defendants prior to July 2, 1890, did not violate the anti-trust act of that year, because it was not then in existence. Whether or not their transactions constituted a violation of the common law is a question much discussed, which it is unnecessary to determine in this case. However that may be, the acts of the defendants and the effect of their transactions in the conduct of the oil trade prior to July 2, 1890, which, if done thereafter, would have constituted a violation of the law of that date, are competent and material evidence of the dominant purpose and the probable effect of their similar transactions in that business since that date, and for that purpose they may be considered. Laying out of view the acts of the defendants prior to July 2, 1890, except as evidence of their purpose, of their continuing conduct, and of its effect, do the stockholding trust of 1899 and its continuing operation constitute an illegal restraint of interstate or international commerce, in violation of the anti-trust act of 1890?

The purpose of this statute was to keep the rates of transportation and the prices of articles in interstate and international commerce open to free competition. Any contract or combination of two or more parties, whereby the control of such rates or prices is taken from separate competitors in that trade and vested in a person or an association of persons, necessarily restricts competition and restrains that commerce. The formation or maintenance by competing corporations of an association to determine their rates of transportation (United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259), agreements of competitive manufacturers and traders not to compete in the purchase or sale of articles in interstate commerce, or to buy or to sell them at prices fixed by a mutual agent or association (Continental Wall Paper Co. v. Voight & Sons Company, 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 217, 20 Sup. Ct. 96, 44 L. Ed. 136; Id., 85 Fed. 271, 285–294, 29 C. C. A. 141, 155–164, 46 L. R. A. 122; Swift & Company v. United States, 196 U. S. 375, 395, 25 Sup. Ct. 276, 49 L. Ed. 518; Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U. S. 390, 396, 27 Sup. Ct. 65, 51 L. Ed. 241; Montague & Company v. Lowry, 193 U. S. 38, 41, 24 Sup. Ct. 307, 48 L. Ed. 608), the conveyance of the stock or property of competitors to a trustee or trustees to hold and operate as a single interest (Distilling & Cattle Feeding Co. v. People, 156 Ill. 448, 488, 41 N. E. 188, 201, 47 Am. St. Rep. 200), the exchange of the stocks or the property of competitive corporations for the stock or for interests in a single corporation, which thereby acquires the power to control the rates of transportation or the prices of articles in interstate com-

merce in which the corporations were dealing (Northern Securities Company v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; United States v. American Tobacco Company [C. C.] 164 Fed. 700, 710; Continental Securities Company v. Interborough Rapid Transit Company [C. C.] 165 Fed. 945, 953; Richardson v. Buhl, 77 Mich. 632, 636, 43 N. W. 1102, 1103, 6 L. R. A. 457; Harding v. American Glucose Company, 182 Ill. 551, 615, 55 N. E. 577, 598, 64 L. R. A. 738, 74 Am. St. Rep. 189; Dunbar v. American Telephone & Telegraph Co., 224 Ill. 9, 23, 24, 79 N. E. 423, 427, 115 Am. St. Rep. 132), are alike declared to be illegal by this law. In the construction and enforcement of this statute, corporations are persons, they are legal entities distinct from their stockholders, and the combination of two or more of them in restraint of trade is as unlawful as the combination of individuals.

By the trust of 1899 more than 30 corporations were combined with the principal company, and that corporation was given the power to fix the rates of transportation and the purchase and selling prices which all these companies should pay and receive for petroleum and its products throughout the republic and in the traffic with foreign nations. The principal company and many of the subsidiary corporations were then and still are engaged in interstate and international commerce, many of them were capable of competing with each other in that trade, and would have been actively competitive if they had been owned by different individuals or different groups of individuals. Thus the principal company in 1899 owned and operated several refineries in New Jersey, West Virginia, and Maryland, which in the year 1906 had a capacity of 19,854,900 barrels of crude oil yearly. The Standard Oil Company of New York, one of the subsidiary companies, owned and operated several refineries in the state of New York, which in the year 1906 had a capacity of 6,732,060 barrels yearly. These companies drew much of the crude oil which they refined from, and marketed much of their products, beyond the limits of the states in which their refineries were located. The majority of the stock of the New York Company and of 18 other corporations engaged in different branches of the production, manufacture, and sale of petroleum and its products was conveyed to the New Jersey Company in exchange for its stock, and the latter has ever since controlled and operated all these corporations and those which they controlled, and has prevented them from competing with it or with each other.

In Northern Securities Company v. United States, 193 U. S. 197, 321, 322, 24 Sup. Ct. 436, 48 L. Ed. 679, Mr. Hill, Mr. Morgan, and their associates acquired the control of a majority of the voting stock of two competitive railway companies, and by means of that ownership the power to prevent them from actually competing. This group of stockholders subsequently transferred their controlling interest in the stock of each of these companies to the Northern Securities Company in exchange for its stock, and the Supreme Court decided that this transaction constituted a combination in restraint of commerce among the states, and affirmed a decree of this court which enjoined the continuance of its operation. The defendants and their associates ac-

quired the control of a majority of the stock of more than 30 corporations, many of which were potentially and naturally competitive, prevented their competition by means of this ownership, and then by the transfer of the stock of 19 of them to the principal company in exchange for its stock placed in that company the control and management of all of them. If it was a violation of the anti-trust act to combine the control of competitive corporations in a third in the case of the Northern Securities Company, why was it not as much a violation of it to combine the control of 10 or 20 or 30 of these corporations in one of their number in the case in hand?

The defendants answer: (1) Because these corporations were not competitors, and had not been such since 1879; (2) because the stockholders of the principal company were the joint owners of the stock of the subsidiary companies, and had the right to convey their stock in the latter to the former in trust for themselves, and Congress was without power to restrict their acquisition, their method of holding, or their disposition of their title to their property, or their use of it; (3) because the corporations whose stock was vested in a holding company in the Northern Securities Company's Case were railway companies, which were charged with the discharge of public duties, their performance of which was peculiarly subject to regulation by the nation and the state, while the corporations whose stock was vested in the Standard Oil Company in this case were private corporations; and (4) because, if any restraint of trade resulted from the trust of 1899, it was neither direct, immediate, nor substantial.

1. The first two answers were overruled by the Supreme Court in the case of the Northern Securities Company, and the questions they present are not debatable here. It is true, with negligible exceptions, that the stockholders of the defendant corporations were the joint equitable owners of them from 1879, or from their subsequent organizations, respectively, until July 1, 1899; but the great majority of these stockholders never held the legal title to their stock, except during a few months between 1896 and 1900. In 1899 the stockholders of the principal company were the stockholders of the subsidiary companies, and each stockholder held the same share or interest in each of the corporations. By means of this joint ownership and the trusts of 1879 and 1882, the natural competition between these corporations had been prevented for a much longer time in 1899 than had the competition between the two railway companies when their stocks were vested in the holding company in 1901 in the Northern Securities Company's Case. But this fact cannot constitute a material difference, and in all other respects the facts of the two cases regarding competition are practically identical. Hill, Morgan, and their associates acquired control of the two railway corporations long before they placed their stock in the Securities Company in 1901. Pearsall v. Great Northern R. Co., 161 U. S. 646, 16 Sup. Ct. 705, 40 L. Ed. 838. Those companies were natural and potential competitors; but this group of stockholders held the power to prevent them from actively competing, and it is as incredible that they were actually doing so after they came under the control of that group as it is that the defendant corpora-

tions were engaged in actual competition during the nineties. It was the granting of the power to prevent competition to the holding company, not the subsequent exercise of that power, that in the opinion of the Supreme Court brought the combination under the ban of the law (Harriman v. Northern Securities Company, 197 U. S. 244, 297, 25 Sup. Ct. 493, 49 L. Ed. 739); and a similar, but greater, power was vested in the principal company in this case by the trust of 1899. For some time, therefore, before the transfer in each of these cases, a group of stockholders controlled a majority of the stock of potentially competitive corporations which they vested in the holding company, so that the latter had the power to operate them together without competition, and the rule which governs one must control the other.

2. The contention that Congress has no power to restrict the acquisition, the method of holding the title, and the disposition and the use of property, was forcibly urged upon the attention of the courts in many forms in the case of the Northern Securities Company, 193 U. S. 272, 273, 24 Sup. Ct. 136, 48 L. Ed. 679; but the answer to it was, as it must be here, that no question of the mere acquisition, or method of holding or of disposition, of the title to property, was there or is here in issue; that the question there was, as it is here, whether a certain method of holding the stocks which control several corporations may be used to prevent competition between them in interstate and international trade. And Congress has plenary and indisputable power under the commercial clause of the Constitution to restrict and regulate the use of every instrumentality employed in interstate or international commerce, so far as it may be necessary to do so in order to prevent the restraint thereof denounced by the anti-trust act of 1890. Northern Securities Company v. United States, 193 U. S. 197, 334, 338, 346, 350, 24 Sup. Ct. 436, 48 L. Ed. 679; United States v. Northern Securities Company (C. C.) 120 Fed. 721, 729; Addyston Pipe & Steel Company v. United States, 175 U. S. 211, 228, 229, 20 Sup. Ct. 96, 44 L. Ed. 136; United States v. Addyston Pipe & Steel Co., 85 Fed. 284, 29 C. C. A. 141, 46 L. R. A. 122; Smiley v. Kansas, 196 U. S. 447, 156, 25 Sup. Ct. 289, 49 L. Ed. 546; New Haven R. R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 398, 26 Sup. Ct. 272, 50 L. Ed. 515; Texas & Pacific Ry. Co. v. Mugg, 202 U. S. 242, 245, 26 Sup. Ct. 628, 50 L. Ed. 1011; Armour Packing Co. v. United States, 209 U. S. 56, 82, 28 Sup. Ct. 428, 52 L. Ed. 681; Shawnee Compress Company v. Anderson, 209 U. S. 423, 433, 28 Sup. Ct. 572, 52 L. Ed. 865; United States v. American Tobacco Company (C. C.) 164 Fed. 700, 718.

3. It is true that railway corporations owe duties to the public which do not rest upon trading, manufacturing, and private transportation companies, such as the duty to operate continually their railroads and the duty to carry persons and property presented for transportation at reasonable rates; but the power of Congress to regulate interstate and foreign commerce and the exertion of that power manifested in the anti-trust act embrace all persons and corporations engaged in such commerce, as is amply illustrated in the various applications of the act which have been made in the several decisions here cited. The mis-

chief against which that law was leveled is not less threatening from a vast combination of private corporations owning and using in interstate and foreign commerce property worth hundreds of millions of dollars than from a combination of two railway companies. The act makes no distinction between them, it excepts neither class, and where Congress has made no exception it is not the province of the courts to do so. No countervailing reason overcomes these considerations, and the vesting of the majority of the stock of many potentially competitive private corporations engaged in interstate commerce in a holding company, which would be violative of the anti-trust act if made by the stockholders of railway companies of that character, must be subject to the condemnation of that statute.

The purpose of the act of July 2, 1890, was to prevent the stifling and the substantial restriction of competition in interstate and international commerce. The test under that act of the legality of a combination or conspiracy is its direct and necessary effect upon such competition. If its necessary effect is but incidentally or indirectly to restrict competition, while its chief result is to foster the trade and increase the business of those who make and operate it, it is not violative of this law. Hopkins v. United States, 171 U. S. 578, 592, 19 Sup. Ct. 40, 43 L. Ed. 290; Anderson v. United States, 171 U. S. 604, 606, 19 Sup. Ct. 50, 43 L. Ed. 300; United States v. Joint Traffic Association, 171 U. S. 505, 568, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 245, 20 Sup. Ct. 96, 44 L. Ed. 136. But if its necessary effect is to stifle, or directly and substantially to restrict, free competition in commerce among the states or with foreign nations, it is a combination or conspiracy in restraint of that trade, and it falls under the ban of the act. United States v. Trans-Missouri Freight Association, 166 U. S. 290, 339, 340, 342, 17 Sup. Ct. 540, 41 L. Ed. 1007; Addyston Pipe & Steel Company v. United States, 175 U. S. 211, 234, 20 Sup. Ct. 96, 44 L. Ed. 136; United States v. Joint Traffic Association, 171 U. S. 505, 576, 577, 19 Sup. Ct. 25, 43 L. Ed. 259; United States v. Northern Securities Company (C. C.) 120 Fed. 721, 722.

And the power to restrict competition in interstate and international commerce, vested in a person or an association of persons by a contract or combination, is indicative of its character; for it is to the interest of the parties that such a power should be exercised, and the presumption is that it will be. In the case under consideration it has been exercised, and thereby the principal company has prevented competition between the corporations it controls since 1899. In Harriman v. Northern Securities Company, 197 U. S., at page 291, 25 Sup. Ct. 503, 49 L. Ed. 739, Chief Justice Fuller, speaking of the decision in the case of the Northern Securities Company, said:

"For the purposes of that suit it was enough that in any capacity the Securities Company had the power to vote the railway shares and to receive the dividends thereon. The objection was that the exercise of its powers, whether those of owner or of trustee, would tend to prevent competition, and thus to restrain commerce. Some of our number thought that, as the Securities Company owned the stock, the relief sought could not be granted; but the conclusion was that the possession of the power, which, if exercised, would prevent

competition, brought the case within the statute, no matter what the tenure of title was."

4. Counsel argue with persuasive force that the transfer of the stock of the 19 corporations to the principal company wrought no substantial restriction of competition, because the owners of that stock had and exercised the same power of restraint before that transfer that was vested in the Standard Oil Company of New Jersey thereafter. But the power of the principal company after the transfer of 1899 to fix the prices at which the 30 corporations should buy and sell the articles in which they dealt, the terms of their purchases and sales, their rates for the transportation of oil and its products, and all the infinite details of their vast operations in which they might compete, and thereby to prevent their competition, was greater, more easily and quickly exercised, and hence more effective, than it could have been in the hands of 3,000 scattered stockholders. The trust deed of 1879, the trust agreement of 1882, the withholding of the separate certificates of shares of stock in each corporation from the holders of the trust certificates in the dissolution of that trust until they took their shares in all of the corporations, bear convincing testimony to the soundness of this proposition. The combination formed by that transfer and its power to restrict competition were less liable to be destroyed, more reliable and permanent, than those springing from the joint ownership by 3,000 stockholders of each corporation. There is much more probability that corporations potentially competitive will separate and compete, when each of their stockholders has a separate certificate of his shares of stock in each corporation, which he is free to sell, than when a majority of the stock of each of the corporations is held by a single corporation, which has the power to vote the stock and to operate them. And although the group of stockholders led by Mr. Hill and Mr. Morgan had the same power to prevent competition between the two railway companies that the stockholders of these corporations had to prevent competition between them, the Supreme Court held in the case of the Northern Securities Company that their transfer of their stock to the holding company granted to that corporation a power so much greater and more effective than that held by the stockholders of the railway companies that the necessary effect of it was a restriction of competition so direct and substantial that it made it an illegal combination in restraint of interstate commerce.

Because the power to restrict competition in interstate commerce granted to the Standard Oil Company of New Jersey by the transfer to it of the stock of the 19 companies and of the authority to manage and operate them and the other corporations which they controlled was the absolute power to prevent competition among any of these corporations, because this power was greater, more easily exercised, more effective, and more durable than that which the 3,000 stockholders of these corporations previously had, because many of these corporations were potentially competitive and were engaged in interstate commerce, and the necessary effect of the transfer of the stock of the 19 companies to the holding company was, under the decision in the case of the Northern Securities Company, a direct and substantial restric-

tion of that commerce, that transfer and the operation of the companies under it constituted a combination or conspiracy in restraint of interstate and international commerce in violation of the anti-trust act of July 2, 1890.

This court is not authorized to punish past violations of this law in this suit. Its power is "to prevent and restrain violations of this act," and the defendants insist that the United States is entitled to no relief, because it has failed to prove that they are now violating, or that when the bill was filed they were violating, this law. But the power to vote the stock, to elect the officers of the subsidiary corporations, to control and operate them, and thereby to restrict their competition in interstate and international commerce, was illegally granted to the Standard Oil Company of New Jersey in 1899, and that company ever since has exercised unlawfully and is still so using that authority, the seven individual defendants are dominating and directing its exercise of this power, the subsidiary corporations are knowingly submitting to and assisting that exercise, and all of them are participating in the fruits of it. These · are menacing and continuing violations of the act which Congress has imposed the duty upon the courts to restrain and prevent.

The second section of the anti-trust act declares that:

"Every person who shall monopolize, or attempt to monopolize, or combine, or conspire, with any other person or persons to monopolize any part of trade or commerce among the several states or with foreign nations shall be guilty of a misdemeanor."

The United States alleges in its bill that the object and effect of the illegal combination and conspiracy, which has been found to exist, were to monopolize, and that the defendants combined and conspired to monopolize, a substantial part of interstate and international commerce in petroleum and its products, in violation of this section of the law. It also avers that at various times between 1870 and the date of the filing of the bill the defendants (1) secured from common carriers preferential rates and rebates; (2) made contracts with some of their competitors which limited the production, output, and markets of the latter; (3) operated companies represented to be independent, when they were not so; (4) procured from employés of railroads information of the trade of competitors, and used it to destroy the latters' business and to secure the commerce for themselves; and (5) sold their products at times and places where there was competition below remunerative prices, and recouped their losses by selling such products at high prices at other times and places.

The gist of the violation of the second section of the act charged in the bill, however, is not the monopolization of interstate or international commerce by a single person or corporation. It is the combination and conspiracy of the numerous defendants, many of them formerly competitors, to restrain trade and to monopolize that commerce, and the burden of its prayer is that the continuance of this combination and conspiracy may be enjoined.

The proof is conclusive that the defendants have secured and now enjoy a very substantial part of the interstate and international commerce in petroleum and its products. But counsel for the defendants in-

sist that this does not constitute an unlawful monopoly, that such a monopoly does not result from the magnitude or proportion of the commerce obtained by one or more individuals or corporations, unless unlawful means are used to obtain it, and that the power of the court to enjoin under the second section is limited to the prohibition of the use of continuing or threatened unlawful means and their like which have a direct and substantial effect to continue the illegal monopoly.

Undoubtedly every person engaged in interstate commerce necessarily attempts to draw to himself, to the exclusion of others, and thereby to monopolize, a part of that trade. Every sale and every transportation of an article which is the subject of interstate commerce evidences a successful attempt to monopolize that trade or commerce which concerns that sale or transportation. If the second section of the act prohibits every attempt to monopolize any part of interstate commerce, it forbids all competition therein, and defeats the only purpose of the law; for there can be no competition, unless each competitor is permitted to attempt to draw to himself, and thereby to monopolize, some part of the commerce. This is not, it cannot be, the proper interpretation of this section. It must be so construed as to abate the mischief it was passed to destroy and to promote the remedy it provided. It was enacted, not to stifle, but to foster, competition, and its true construction is that, while unlawful means to monopolize and to continue an unlawful monopoly of interstate and international commerce are misdemeanors and enjoinable under it, monopolies of part of interstate and international commerce by legitimate competition, however successful, are not denounced by the law, and may not be forbidden by the courts. Whitwell v. Continental Tobacco Co., 60 C. C. A. 290, 298, 125 Fed. 454, 462, 64 L. R. A. 689; Phillips v. Iola Portland Cement Company, 61 C. C. A. 19, 20, 125 Fed. 593, 594.

But in the case under consideration the combination and conspiracy in restraint of trade and its continued execution, which have been found to exist, constitute illegal means by which the conspiring defendants combined, and still combine and conspire, to monopolize a part of interstate and international commerce, and by which they have secured an unlawful monopoly of a substantial part of it, and this conspiracy constitutes as clear and complete a violation of the second as of the first section of the act. Upon the ground that the defendants have thus violated, and are violating, the second section of the act, as fully as upon the ground that they have violated its first section, the decree in favor of the government must be, and is, based.

The combination and conspiracy, including in those terms the illegal devices by which they were created and are continued, were the source, and they are the support, of the unlawful monopoly. Without them it would not have existed and cannot continue, and the continued use of these and like means, including the distribution of the stock of the various defendants ratably among the shareholders of the Standard Oil Company, and the conveyance of the physical property and business of the defendants to one of their number to perpetuate the unlawful monopoly, must be, and it is, prohibited by the decree herein.

As illegal means whereby the unlawful monopoly was created and is maintained have been proved and found in the combination and con-

spiracy, and as their use to prolong the unlawful monopoly must be enjoined, the questions whether or not the charges in the bill that other unlawful means were or are employed are true, and whether or not the power of the court to prevent the existence or continuance of a monopoly is limited to the prohibition of the use of illegal means and their like have become moot, and it is unnecessary to express any opinion upon them.

It is a grave and delicate task to determine the exact limits of the relief to which the government is entitled. The prohibition of the court must forbid the performance of the continuing and threatened illegal acts which have had, and are having, a direct and substantial effect to restrain commerce among the states and with foreign nations, and to continue the unlawful monopoly and all like acts which have the same effect. But it may not prohibit all possible violations of the law, and thus put the whole conduct of the defendant's business at the peril of a summons for contempt. Past unlawful competition does not deprive parties of their right to conduct lawful competition. New York, N. H. & H. R. R. v. Interstate Commerce Commission, 200 U. S. 361, 404, 26 Sup. Ct. 272, 282, 50 L. Ed. 515. The court must steer as best it may (Swift & Company v. United States, 196 U. S. 375, 396, 25 Sup. Ct. 276, 279, 49 L. Ed. 518) between its duty "to prevent and restrain violations of" this act of Congress and its duty not to deprive the defendants of their right to engage in lawful competition for interstate and international commerce. In our opinion this duty will be discharged, the rights of the defendants to engage in lawful competition for interstate and international commerce will not be infringed, and the full relief to which the United States is entitled under the law and the evidence will be granted by a decree in its favor to the following effect:

That the Standard Oil Company of New Jersey, the seven individual defendants, and all of the subsidiary defendant companies engaged in commerce in petroleum or its products among the states or with foreign nations controlled by the principal company, have entered into and are operating a combination or conspiracy in restraint of trade and commerce among the several states, such as is denounced as illegal by section 1 of the anti-trust act of July 2, 1890, and have combined and conspired to monopolize, have secured thereby an unlawful monopoly of, and are combining and conspiring to continue to monopolize, a substantial part of interstate and international commerce in violation of section 2 of that act; that the Standard Oil Company of New Jersey be enjoined from voting the stock in any of these defendant companies which it acquired by virtue of that combination, and from exercising or attempting to exercise any control, direction, supervision, or influence over the acts of any of these companies by virtue of its holding of the stock and power secured through that combination; that the other defendant companies which are parties to the combination be enjoined from declaring or paying any dividends to the Standard Oil Company on account of any stock acquired by it through that combination, from permitting that company to vote such stock or to direct the policy of any of said companies, or to exercise any control whatsoever over their corporate acts by virtue of the stock or power

which it secured by means of that combination; that the seven individual defendants and the corporations and partnerships that became parties to this combination be enjoined from continuing it or carrying it out, and from entering into or performing any like combination the effect of which is, or will be, to restrain or monopolize, or to continue their unlawful monopoly of interstate commerce in petroleum and its products, in violation of the anti-trust act, either (1) by placing the control of any of said corporations in a trustee, or in a group of trustees, by means of the holding of its stock or property by others than its equitable owners, by causing the conveyance of the physical property and business of two or more potentially competitive parties to the combination to any party thereto, or by any other such act, or (2) by making any express or implied agreement or arrangement together, or one with another, like that adjudged illegal hereby, relative to the control or management of any of said corporations, or the price or terms of purchase or of sale, or the rates of transportation of petroleum or its products in interstate or international commerce, or relative to the quantities thereof purchased, sold, transported, or manufactured by any of said corporations, which will have a like effect in restraint of commerce among the states, in the territories, and with foreign nations to that of the combination the operation of which is hereby enjoined; that the defendants who are parties to the combination be enjoined from engaging or continuing in interstate commerce in petroleum and its products during the continuance of the illegal combination; that the United States recover its costs of the defendants who are parties to the combination, and that the other defendants be dismissed.

VAN DEVANTER, HOOK, and ADAMS, Circuit Judges, concur.

HOOK, Circuit Judge (concurring). The principal conclusions, upon which we are all agreed, may be briefly stated as follows: A holding company, owning the stocks of other concerns whose commercial activities, if free and independent of a common control, would naturally bring them into competition with each other, is a form of trust or combination prohibited by section 1 of the Sherman anti-trust act. The Standard Oil Company of New Jersey is such a holding company. The defendants, who are in the combination, are enjoined from continuing it, and from forming another like it. The holding company is enjoined from exercising the rights of a stockholder in the subordinate companies, and they are enjoined from allowing it to do so or to benefit therefrom in the way of dividends. A means of dissolving the present form of combination is left open, to wit: The distribution among the stockholders of the holding company of the stocks it owns in the subordinate companies, to the end that each corporate member of the combination engaging in interstate or foreign commerce shall in the future have and exercise corporate independence, with its own particular set of stockholders not united with or tied to those of its competitors, actual or potential, under a single or common control. Until the defendants discontinue the operation of the combination, they are denied the right to engage in commerce among the states or in

the territories. The defendants in the combination are also monopolizing interstate and foreign commerce in petroleum and its products, contrary to section 2 of the act. A wrongful method employed to gain the monopoly is found to exist in the unlawful combination above mentioned, and it therefore becomes unnecessary to determine the other charges upon that subject in the petition of the government. It is thought that with the end of the combination the monopoly will naturally disappear; but lest, instead of resulting that way, the monopoly so wrongfully gained be perpetuated by the aggregation of the physical properties and instrumentalities by which it is maintained in the hands of a member of the combination and the liquidation and retirement from business of the other members, it is held that such a course would violate the decree.

The issues in the case before us and the scope of the arguments of counsel make it not inappropriate that I express more fully, but in a general way, my views of the proper construction of the anti-trust act, particularly of the second section, directed against the monopolizing of interstate and foreign commerce. The extent and limitations of the first section have been pretty well defined in the many adjudged cases. The construction of the act should not be so narrow or technical as to belittle the work of Congress; but, on the contrary, it should accord with the great importance of the subject of the legislation and the broad lines upon which the act was framed. The language employed in the act is as comprehensive as the power of Congress in the premises, and the purpose was not to hamper business fairly conducted, but adequately to promote the common interest in freedom of competition and to remove improper obstacles from the channels of commerce that all may enter and enjoy them. The wisdom of a law lies in its spirit as well as in its letter, and unless they go together in its construction and application justice goes astray.

The true test to apply to a case under the first section is not whether the restraint upon competition imposed by the contract or combination in question should be regarded as reasonable or as unreasonable, but whether it is direct and appreciable. Conceptions of the reasonable and unreasonable are much too diverse to afford a stable, uniform rule for construing a law which contains no mention of those terms. So much depends upon the point of view, that it frequently happens that what appears to one to be wholly unreasonable is thought entirely reasonable by another. But if the restraint is direct and appreciable, and not merely incidental to some contract having a lawful purpose, it falls clearly within the prohibition of the statute, and there is no room for further construction. There are many contracts which, in the days when the common law was forming, would have been adjudged contrary to public welfare, as being in restraint of the narrow trade of those times, but which in a commercial age like the present have such a negligible effect in that direction as to be no longer evil within the meaning of the law. Their effect is so indirect and inappreciable that it is properly referable to the class de minimis, and it is not to be supposed Congress had them in view when it legislated to preserve freedom of competition in the broad field of interstate and foreign

commerce. Vital principles, however, have not changed; the change is merely in the conditions upon which they operate.

The second section of the act provides:

"Every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states or with foreign nations, shall be deemed guilty of a misdemeanor," etc.

Manifestly this section is quite distinct from the first, and was not intended to cover precisely the same ground. To say otherwise would be to impute to Congress the doing of the unnecessary and useless. Though the natural tendency of a combination in restraint of trade declared illegal by section 1 may be and generally is towards monopoly denounced by section 2, and may even accomplish it, yet the scope of the latter section is far broader and was designed to extend also to monopolies secured by other means than by contracts, combinations, and conspiracies in restraint of trade, which, as those terms necessarily imply, require concert between two or more persons or corporations. One person or corporation may offend against the second section by monopolizing, but the first section contemplates conduct of two or more. A cursory reading of the act shows this. That it was the intention of Congress to condemn monopolies, not based on illegal combinations among several, but secured by single persons, natural or artificial, by other means, also appears from the history of the legislation. The bill originally introduced in the Senate bore slight resemblance to the law finally enacted, and there was uncertainty as to the particular constitutional authority for the legislation. At one time it was thought by some to rest upon the jurisdiction of the courts of the United States of controversies between citizens of different states, and at another there were provisions regarding competition between the products and manufactures of one state with those of another. Finally, after much difference of view, the bill, with many amendments, was referred to the judiciary committee of which Senator Edmunds was chairman, and reframed by it under the commerce clause of the Constitution. It was then reported in the simple, comprehensive form in which it finally became a law. A motion was made to amend the second section by striking out the words "monopolize or attempt to monopolize" so it would read:

"Every person who shall combine or conspire with any other person or persons to monopolize," etc.

But it was rejected.

What is a monopoly in contravention of the statute? I would not say that every person who strives to gain as much as he can of the commerce in a commodity is thereby attempting to monopolize that commerce, within the meaning of the term as it is employed in legislative acts and understood in the courts. Magnitude of business does not, alone, constitute a monopoly, nor effort at magnitude an attempt to monopolize. To offend the act the monopoly must have been secured by methods contrary to the public policy as expressed in the statutes or in the common law. The wrongful element in a monopoly under the act is not necessarily the violation of some penal statute, but

may consist of other acts or conduct which the law condemns and the benefit of which, if sought in a civil court of justice, could not be obtained. And it may be observed in this connection that there is more of the Decalogue in the common law respecting the trading of merchants than is sometimes supposed. On the other hand, Congress did not intend to impede legitimate commercial activity, nor put a limit to its fruits. The genius and industry of man, when kept to ethical standards, still have full play, and what he achieves is his; and this applies as well to a corporation, in which the energies of many are concentrated under the authority of law in a single organization. A railroad company, for instance, which has extended its lines across the continent and conquered the waste or wilderness, is not a monopoly within the statute merely because its capital is great and it alone serves the tributary country; and so of an industrial corporation, the wisdom and business sagacity of whose managers have foreseen and taken advantage of the natural tendencies of trade and caused it to outstrip all competition. Success and magnitude of business, the rewards of fair and honorable endeavor, were not among the evils which threatened the public welfare and attracted the attention of Congress. But when they have been attained by wrongful or unlawful methods, and competition has been crippled or destroyed, the elements of monopoly are present. A governmental grant of special privileges is no longer essential, though in England the Crown was for a period the frequent source of monopolies, which were condemned by the courts and finally by Parliament as contrary to public welfare. It was these Bacon had in mind in his advice to Villiers:

"But especially care must be taken that monopolies, which are the cankers of all trading, be not admitted under specious colors of public good."

The modern doctrine is but a recognition of the obvious truth that what a government should not grant, because injurious to public welfare, the individual should not be allowed to secure and hold by wrongful means. The baneful effect is the same, whether the monopoly comes as a gift from a government or is the result of individual wrongdoing. Nor can arguments of reduced prices of product, economy in operation, and the like, have weight. One English sovereign was accustomed to recite in the preambles of royal grants of monopolies the special benefits to be derived; but it was then, and is now, almost universally believed that the ultimate, if not the immediate, effect upon the development of trade and commerce is detrimental, and that belief, so generally prevalent and enduring, has been embodied in legislation, the policy of which is not open to question in the courts.

During the discussion of the amendment above referred to, apprehension was expressed over the broad language of the second section of the proposed act, and inquiry was made whether the committee having the bill in charge intended it should make it an offense if an individual engaged in interstate and foreign commerce, "by his own skill and energy, by the propriety of his conduct generally, shall pursue his calling in such a way as to monopolize a trade." Assurances were given that the term "monopolize" had no such signification, but that it contemplated the employment of means which prevented others

from engaging in fair competition, the engrossing of the trade, and the like. Undoubtedly this view prevailed at the passage of the law.

## DECREE.

After deliberation, it is ordered, adjudged, and decreed:

Section 1. That in and prior to the year 1899 there were 20 corporations, organized, respectively, under the laws of various states, engaged in commerce in petroleum and its products, either among the states, or in the territories, or with foreign nations, and these corporations held a majority of the stock and controlled the business and operations of many other corporations engaged in that commerce; that one of these corporations was the Standard Oil Company of New Jersey, hereafter called the Standard Company, which had a capital stock of $10,000,000; that since the year 1890 the defendants named in section 2 of this decree have entered into and are carrying out a combination or conspiracy in pursuance whereof about the year 1899 they caused the capital stock of the Standard Company to be increased to $100,000,000, caused a majority of the stock of the 19 companies, and the power to control them, and to manage their trade, and the power to control the corporations which they controlled and to manage their trade, to be vested in and held by the Standard Company in exchange for its stock, which was issued to the former holders of the stock of the 19 companies, and caused the Standard Company ever since to control all these corporations, hereafter called the subsidiary corporations, and to manage their trade without competition among themselves as the trade and business of a single person; that this combination or conspiracy is a combination or conspiracy in restraint of trade and commerce in petroleum and its products among the several states, in the territories, and with foreign nations, such as an act of Congress approved July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), entitled "An act to protect trade and commerce against unlawful restraints and monopolies," declares to be illegal.

Section 2. That the defendants John D. Rockefeller, William Rockefeller, Henry H. Rogers, Henry M. Flagler, John D. Archbold, Oliver H. Payne, and Charles M. Pratt, hereafter called the seven individual defendants, united with the Standard Company and other defendants to form and effectuate this combination, and since its formation have been and still are engaged in carrying it into effect and continuing it; that the defendants Anglo-American Oil Company (Limited), Atlantic Refining Company, Buckeye Pipe Line Company, Borne-Scrymser Company, Chesebrough Manufacturing Company, Consolidated, Cumberland Pipe Line Company, Colonial Oil Company, Continental Oil Company, Crescent Pipe Line Company, Henry C. Folger, Jr., and Calvin N. Payne, a copartnership doing business under the firm name and style of Corsicana Refining Company, Eureka Pipe Line Company, Galena Signal Oil Company. Indiana Pipe Line Company, Manhattan Oil Company, National Transit Company, New York Transit Company, Northern Pipe Line Company, Ohio Oil Company, Prairie Oil & Gas Company, Security Oil Company, Solar Refining Company, Southern Pipe Line Company, South Penn Oil Company, Southwest Pennsylvania Pipe Lines Company, Standard Oil Company of California, Standard Oil Company of Indiana, Standard Oil Company of Iowa, Standard Oil Company of Kansas, Standard Oil Company of Kentucky, Standard Oil Company of Nebraska, Standard Oil Company of New York, Standard Oil Company of Ohio, Swan & Finch Company, Union Tank Line Company, Vacuum Oil Company, Washington Oil Company, and Waters-Pierce Oil Company, have entered into and became parties to this combination and are either actively operating or aiding in the operation of it; that by means of this combination the defendants named in this section have combined and conspired to monopolize, have monopolized, and are continuing to monopolize a substantial part of the commerce among the states, in the territories, and with foreign nations, in violation of section 2 of the anti-trust act.

Section 3. That the defendants Argand Refining Company, American Lubricating Oil Company, Acme Oil Company, Baltimore United Oil Company, Buffalo Natural Gas Fuel Company, Bush & Denslow Manufacturing Company,

Camden Consolidated Oil Company, Commercial Natural Gas Company. Connecting Gas Company, Eastern Ohio Oil & Gas Company, Eclipse Lubricating Oil Company, Florence Oil & Refining Company, Franklin Pipe Company (Limited), Lawrence Natural Gas Company, Mahoning Gas Fuel Company, Mountain State Gas Company, National Fuel Gas Company, Northwestern Ohio Natural Gas Company, Oil City Fuel Supply Company, Oswego Manufacturing Company, Pennsylvania Gas Company, Pennsylvania Oil Company, People's Natural Gas Company, Pittsburg Natural Gas Company, Platt and Washburn Refining Company, Republic Oil Company, Salamanca Gas Company, Standard Oil Company of Minnesota, Taylorstown Natural Gas Company, Tide Water Oil Company, Tide Water Pipe Company (Limited), United Natural Gas Company, and United Oil Company, have not been proved to be engaged in the operation or carrying out of the combination, and the bill is dismissed as against each of them.

Section 4. That in the formation and execution of the combination or conspiracy the Standard Company has issued its stock to the amount of more than $90,000,000 in exchange for the stocks of other corporations which it holds, and it now owns and controls all of the capital stock of many corporations, a majority of the stock or controlling interests in some corporations, and stock in other corporations as follows:

| Name of Company. | Total Capital Stock. | Owned by Standard Oil Company. |
|---|---|---|
| Anglo-American Oil Company (Limited) | £ 1,000,000 | £ 999,740 |
| Atlantic Refining Company | $ 5,000,000 | $5,000.000 |
| Borne-Scrymser Company | 200,000 | 199,700 |
| Buckeye Pipe Line Company | 10,000,000 | 9,999,700 |
| Chesebrough Manufacturing Company, Consolidated | 500,000 | 277,700 |
| Colonial Oil Company | 250,000 | 249,300 |
| Continental Oil Company | 300,000 | 300,000 |
| Crescent Pipe Line Company | 3,000,000 | 3,000,000 |
| Eureka Pipe Line Company | 5,000,000 | 4,999,400 |
| Galena Signal Oil Company | 10,000,000 | 7,079,500 |
| Indiana Pipe Line Company | 1,000,000 | 999,700 |
| Lawrence Natural Gas Company | 450,000 | 450,000 |
| Mahoning Gas Fuel Company | 150,000 | 149,900 |
| Mountain State Gas Company | 500,000 | 500,000 |
| National Transit Company | 25,455,200 | 25,451,650 |
| New York Transit Company | 5,000,000 | 5,000,000 |
| Northern Pipe Line Company | 4,000,000 | 4,000,000 |
| Northwestern Ohio Natural Gas Company | 2,775,250 | 1,649,450 |
| Ohio Oil Company | 10,000,000 | 9,999.850 |
| People's Natural Gas Company | 1,000,000 | 1,000,000 |
| Pittsburg Natural Gas Company | 310,000 | 310,000 |
| Solar Refining Company | 500,000 | 499,400 |
| Southern Pipe Line Company | 10,000,000 | 10,000,000 |
| South Penn Oil Company | 2,500,000 | 2,500,000 |
| Southwest Pennsylvania Pipe Lines | 3,500,000 | 3,500,000 |
| Standard Oil Company of California | 17,000,000 | 16,999,500 |
| Standard Oil Company of Indiana | 1,000,000 | 999,000 |
| Standard Oil Company of Iowa | 1,000,000 | 1,000,000 |
| Standard Oil Company of Kansas | 1,000,000 | 999,300 |
| Standard Oil Company of Kentucky | 1,000,000 | 997,200 |
| Standard Oil Company of Nebraska | 600,000 | 599,500 |
| Standard Oil Company of New York | 15,000,000 | 15,000,000 |
| Standard Oil Company of Ohio | 3,500,000 | 3,499,400 |
| Swan & Finch Company | 100,000 | 100,000 |
| Union Tank Line Company | 3,500,000 | 3,499.400 |
| Vacuum Oil Company | 2,500,000 | 2,500,000 |
| Washington Oil Company | 100,000 | 71,480 |
| Waters-Pierce Oil Company | 400,000 | 274,700 |

That the defendant National Transit Company, which is owned, and controlled by the Standard Oil Company as aforesaid, owns and controls the amounts of the capital stocks of the following named corporations and limited partnerships stated opposite each, respectively, as follows:

| Name of Company. | Total Capital Stock. | Owned by National Transit Company. |
|---|---|---|
| Connecting Gas Company | $ 825,000 | $ 412,000 |
| Cumberland Pipe Line Company | 1,000,000 | 998,500 |
| East Ohio Gas Company | 6,000,000 | 5,999,500 |
| Franklin Pipe Company (Limited) | 50,000 | 19,500 |
| Prairie Oil & Gas Company | 10,000,000 | 9,999,500 |

That the Standard Company has also acquired the control, by the ownership of its stock or otherwise, of the Security Oil Company, a corporation created under the laws of Texas, which owns a refinery at Beaumont, in that state, and the Manhattan Oil Company, a corporation which owns a pipe line situated in the states of Indiana and Ohio; that the Standard Company, and the corporations and partnerships named in section 2, are engaged in the various branches of the business of producing, purchasing, and transporting petroleum in the principal oil-producing districts of the United States, in New York, Pennsylvania, West Virginia, Tennessee, Kentucky, Ohio, Indiana, Illinois, Kansas, Oklahoma, Louisiana, Texas, Colorado, and California, in shipping and transporting the oil through pipe lines owned or controlled by these companies from the various oil-producing districts into and through other states, in refining the petroleum and manufacturing it into various products, in shipping the petroleum and the products thereof into the states and territories of the United States, the District of Columbia, and to foreign nations, in shipping the petroleum and its products in tank cars owned or controlled by the subsidiary companies into various states and territories of the United States and into the District of Columbia, and in selling the petroleum and its products in various places in the states and territories of the United States, in the District of Columbia, and in foreign countries; that the Standard Company controls the subsidiary companies and directs the management thereof, so that none of the subsidiary companies competes with any other of those companies or with the Standard Company, but their trade is all managed as that of a single person.

Section 5. That the stocks of the various corporations which are named in section 2 and described in section 4 of this decree, held by the Standard Company, were acquired and are held by it by virtue of the illegal combination; that the Standard Company, its directors, officers, agents, servants, and employés, are enjoined and prohibited from voting any of the stock in any of the subsidiary companies named in section 2 of this decree and from exercising or attempting to exercise any control, direction, supervision, or influence over the acts of these subsidiary companies by virtue of its holding of their stock. And these subsidiary companies, their officers, directors, agents, servants, and employés are, and each of them is, enjoined and prohibited from declaring or paying any dividends to the Standard Company on account of any of the stock of these subsidiary companies held by the Standard Company, and from permitting the latter company to vote any stock in, or to direct the policy of, any of said companies, or to exercise any control whatsoever over the corporate acts of any of said companies by virtue of such stock, or by virtue of the power over such subsidiary corporation acquired by means of the illegal combination. But the defendants are not prohibited by this decree from distributing ratably to the shareholders of the principal company the shares to which they are equitably entitled in the stocks of the defendant corporations that are parties to the combination.

Section 6. That the defendants named in section 2 of this decree, their officers, directors, agents, servants, and employés, are enjoined and prohibited from continuing or carrying into further effect the combination adjudged illegal hereby, and from entering into or performing any like combination or conspiracy, the effect of which is, or will be, to restrain commerce in petroleum or its products among the states, or in the territories, or with foreign

nations, or to prolong the unlawful monopoly of such commerce obtained and possessed by defendants as before stated, in violation of the act of July 2, 1890, either (1) by the use of liquidating certificates, or other written evidences, of a stock interest in two or more potentially competitive parties to the illegal combination, by causing the conveyance of the physical property and business of any of said parties to a potentially competitive party to this combination, by causing the conveyance of the property and business of two or more of the potentially competitive parties to this combination to any party thereto, by placing the control of any of said corporations in a trustee, or group of trustees, by causing its stock or property to be held by others than its equitable owners, or by any similar device, or (2) by making any express or implied agreement or arrangement together, or one with another, like that adjudged illegal hereby relative to the control or management of any of said corporations, or the price or terms of purchase, or of sale, or the rates of transportation, of petroleum or its products in interstate or international commerce, or relative to the quantities thereof purchased, sold, transported, or manufactured by any of said corporations, which will have a like effect in restraint of commerce among the states, in the territories, and with foreign nations to that of the combination the operation of which is hereby enjoined.

Section 7. The defendants named in section 2 of this decree are enjoined and prohibited, until the discontinuance of the operation of the illegal combination, from engaging or continuing in commerce among the states, or in the territories of the United States.

Section 8. The United States shall recover its costs herein, to be taxed by the clerk of the court, and shall have execution therefor.

Section 9. This decree shall take effect thirty (30) days after its entry in case no appeal is taken from it. If an appeal is taken from this decree by the defendants, or by any of them, and a bond in the amount of fifty thousand dollars ($50,000) conditioned to operate as a supersedeas approved by one of the circuit judges is given within thirty (30) days after the entry of this decree, then this decree, unless reversed or modified, shall take effect thirty (30) days after the final decision of this case by the Supreme Court upon the appeal.